FIREMAN'S FUND INSURANCE COMPANY, APPELLEE, *v.* BPS COMPANY, D.B.A. SECUR-IT PERSONAL STORAGE, APPELLANT.

(No. 83AP-846 — Decided
February 28, 1985.)

*Elliott & Barone* and *Joseph J.
Barone,* for appellee.

*Bailey, Houfek & Hoover* and
*Douglas E. Hoover,* for appellant.

STRAUSBAUGH, J. Defendant, BPS
Company, d.b.a. Secur-It Personal
Storage, appeals from the judgments of
the Franklin County Court of Common
Pleas filed on May 20, 1981 and August
19, 1983 ending in an award in favor of
plaintiff for $19,449.22 based upon a
breach of an implied warranty of fitness
in a commercial lease. In support of its
appeal, defendant raises the following
seven assignments of error:

"I. The judgment regarding liabili-
ty is contrary to law as there are no im-
plied warranties pertaining to commer-
cial lease arrangements for storage of
goods. Even were there such implied
warranties, the language of the lease
agreement in the instant case disclaimed
them.

"II. The judgment for consequen-
tial damages stated in the judgment en-
try regarding liability is contrary to law.

"III. The court erred in overruling
defendant's motion for summary judg-
ment.

"IV. The court erred in overruling
defendant's motion for judgment not-
withstanding verdict at the conclusion of
trial regarding liability.

"V. The court erred in admitting
evidence of a prior unrelated settlement
of a claim by defendant.

"VI. At the trial regarding
damages the court erred in admitting
hearsay evidence.

"VII. The judgment for damages is
not supported by the evidence and is
contrary to law as the plaintiff did not
sustain its burden or proof."

The facts as revealed by the record
show that defendant, a general partner-
ship involved in the self-storage
business, entered into a lease agreement
with Liberty Moving & Storage Com-
pany ("Liberty") on April 21, 1978 for
the rental of storage space at

defendant's facility on Busch Boulevard in Columbus, Ohio. Liberty later discovered that some of the property stored in defendant's facility was damaged by water. Six separate claims were eventually filed for damaged merchandise in six of the units rented and Liberty thereafter notified its insurance carrier, Fireman's Fund Insurance Company ("Fireman's Fund"), which paid the respective claims. Under the subrogation clause of its insurance contract, Fireman's Fund then brought this action on July 25, 1979 to recover the payments made for each claim. In its complaint, plaintiff alleged that defendant was negligent in allowing water to leak into its leased facility and damage the furniture stored therein; for breach of duty as a warehouseman under R.C. 1307.09 by not exercising such care as a reasonably careful man would exercise under like circumstances to protect the property from water damage; for misrepresenting to Liberty that the space was watertight and that no water problems existed, with full knowledge that such representations were false and intentionally made for the purpose of inducing Liberty to enter into a lease agreement, with the result that Liberty entered into the lease agreement in reliance upon said false representations; and for breach of its implied warranty of fitness in the lease agreement for use of the property as a storage facility. As a result of each alleged wrongdoing by defendant, plaintiff claimed that damages were incurred in the amount of $16,789.37. Defendant answered the complaint denying all liability for the damages sustained, and, as part of its defense, claimed that Liberty's losses were due to its own negligence; that Liberty assumed the risk of any loss incurred while leasing defendant's property; and that, because the relationship of the parties was one of landlord and tenant, the risk of loss fell upon plaintiff's insured, the tenant, by virtue of their lease agreement.

On June 12, 1980, defendant moved for summary judgment on all plaintiff's claims. However, on September 29, 1980, the motion was overruled by the trial court. A jury trial upon the issue of liability alone was commenced on April 21, 1981 and, at the close of plaintiff's case, defendant moved for a directed verdict. By agreement of the parties, plaintiff's claim for relief, based upon the allegation that defendant was a warehouseman, was dismissed. In addition, the trial court found that the parties were equal business entities and that the exculpatory clause found in the lease was valid and effectively relieved defendant of any liability based upon its negligence. The court also found no evidence to support plaintiff's claim of fraud. As for plaintiff's claim based upon an implied warranty, the trial court specifically stated:

"The defendant points out that the one remaining ground for possible recovery here based upon implied warranty is a novel approach, but the court feels that there is an issue here, however new it may be in the law of Ohio, and we recognize that the cases in this state deal with questions of implied warranty as they affect residences and perhaps other tangible property or other property which is tangible, that is, but the court feels that if there is not a principle of this kind in Ohio law with reference to this type of transaction, there should be. Maybe the question would be resolved in that situation in favor of the defendant, but I think it should be dealt with because the evidence before the court presents a serious problem of substantial justice in this area.

"We will overrule the motion as it applies to that count or claim in the plaintiff's complaint, which means as we state that we are here for the balance of the trial on that issue."

At the close of the trial, the jury was instructed by the court to determine from the evidence whether defendant by offering plaintiff's insured storage space

for a fee warranted by implication that such space was fit for the purpose for which it was used. If the jury found that such a warranty was given by defendant, the jury was then instructed to consider whether the language in the disclaimer relieved defendant of responsibility for the damages alleged. The jury returned a verdict in favor of plaintiff, and an entry was then filed by the court on May 20, 1981 wherein it was ordered that defendant be held liable for the damages incurred by plaintiff's insured as a result of water affecting plaintiff's insured's property while stored at defendant's storage facility by virtue of defendant's breach of its implied warranty.

Defendant then filed timely motions for judgment notwithstanding the verdict or, in the alternative, a new trial. The motions were overruled by order of the court journalized on September 2, 1981, and defendant filed a notice of appeal from that order on September 22, 1981. Defendant's appeal, however, was dismissed by this court on February 11, 1982 on the ground that a judgment rendered in favor of plaintiff on the issue of liability, which leaves the amount of damages to be awarded unresolved until some future time, does not constitute a final appealable order. *Fireman's Fund Ins. Co.* v. *BPS Co.* (1982), 4 Ohio App. 3d 3.

The case was then referred to a referee for a hearing on the issue of damages and, on June 24, 1983, the referee released his report recommending that judgment be entered in favor of plaintiff for $19,449.22. The trial court approved and adopted the referee's report as its own and ordered judgment in favor of plaintiff in the same amount.

Because defendant's first four assignments of error are interrelated they will be considered together. It is defendant's contention that there is no legal precedent in Ohio recognizing an implied warranty of fitness in a commercial lease agreement and that, even if such a warranty did, in fact, exist, the disclaimer found in the lease at paragraph three would preclude any liability on defendant's part for the damages complained of. Plaintiff admits that there is no case law in Ohio regarding the issue of an implied warranty of fitness for commercial leases. However, it argues that there is a trend in other jurisdictions towards protecting consumers through recognition of an implied warranty in lease agreements and that several states have extended this trend to include commercial leases. The trial court, therefore, did not err by allowing the jury to determine whether an implied warranty of fitness was included in the lease agreement. As for the disclaimer, plaintiff argues that the language found in the lease agreement was not conspicuous enough to warrant the exclusion of defendant's liability in the present case and that the jury was correct in finding that the disclaimer did not preclude defendant's liability for a breach of its implied warranty.

As previously noted, the trial court did not specifically rule on the existence of an implied warranty in the lease agreement or the effects of the disclaimer, but, instead, submitted both issues to the jury as triers of fact to make the final decision. An implied warranty is recognized in a contractual agreement under certain circumstances, but only by operation of law; as such, the existence of an implied warranty as a matter of law is to be determined by the court and not the jury. It was error for the trial court in the instant case to allow the jury to determine if an implied warranty of fitness did, in fact, exist in the lease, for such a question was a matter of law for the trial court to decide. The same is true of the court's submittal to the jury of the question of the scope of the disclaimer found in the lease agreement. Where the language used in a contract is clear and unambiguous, interpretation thereof is for the court and not the jury. *New York, Chicago & St. Louis*

*RR. Co.* v. *Heffner Constr. Co.* (1967), 9 Ohio App. 2d 174, 177 [38 O.O.2d 187].

Ohio has historically followed the doctrine of *caveat emptor* with regard to the law of landlord and tenant. In the absence of an agreement or some fraudulent representation or concealment, a lessor does not impliedly warrant that the premises shall be tenantable, in a safe condition, or fit for the use to which the lessee intended it. The tenant was said to take the premises as it was, including all its imperfections. 33A Ohio Jurisprudence 2d (1976) 322, Landlord and Tenant, Section 417. A landlord who no longer maintained possession or control over the premises owed no duty towards either his tenant or any other party who entered onto the premises during the tenancy to ensure that the premises was safe, unless there was concealment of a known danger not readily discoverable. *Rosen* v. *Concordia Evangelical Lutheran Church, Inc.* (1960), 111 Ohio App. 54, 58 [13 O.O.2d 418].

However, with the enactment of legislation covering the landlord-tenant relationship (R.C. Chapter 5321), the doctrine of *caveat emptor* has been modified to a certain degree in the case of rental agreements concerning residential premises. See, also, *Shroades* v. *Rental Homes, Inc.* (1981), 68 Ohio St. 2d 20 [22 O.O.3d 152]; *Laster* v. *Bowman* (1977), 52 Ohio App. 2d 379 [6 O.O.3d 428]; *Glyco* v. *Schultz* (1972), 35 Ohio Misc. 25 [62 O.O.2d 459]. Other jurisdictions, as well, have rejected the doctrine of *caveat emptor* in regard to residential leases. See Annotation (1971), 40 A.L.R. 3d 646.

While there is a trend towards protection for consumers in regard to residential leases, the same analogy has not been as widely accepted when examining the relationship of parties to a commercial lease. Several jurisdictions which have recognized implied warranties of fitness in residential leases have chosen not to extend such protection to the consumer in commercial leases. *J. B. Stein & Co.* v. *Sandberg* (1981), 95 Ill. App. 3d 19, 419 N.E. 2d 652; *Golub* v. *Colby* (1980), 120 N.H. 535, 419 A. 2d 397; *Service Oil Co., Inc.* v. *White* (1975), 218 Kan. 87, 542 P. 2d 652. See, also, *Buker* v. *Natl. Management Corp.* (1983), 16 Mass. App. 36, 448 N.E. 2d 1299; *Olson* v. *Scholes* (1977), 17 Wash. App. 383, 563 P. 2d 1275.

In the absence of Ohio case law specifically rejecting the doctrine of *caveat emptor* in regard to commercial leases, we cannot conclude that in light of a trend toward change in residential leases such a modification in the landlord-tenant law requires a reevaluation of the relationship of the parties to a commercial lease.

Even if an implied warranty of fitness was recognized in commercial lease agreements, the disclaimer in the lease herein specifically exempts defendant from any liability for the damages suffered by plaintiff's insured.

Paragraph three of the lease specifically provides:

"Insurance and Indemnity. Any insurance which may be carried by Landlord or Tenant against any loss or damage to the buildings on the premises, the space or its contents and other improvements situated on the premises shall be for the sole benefit of the party carrying such insurance and under the sole control of such party. Each of the parties hereto hereby waives their respective right of subrogation against the other party. *Landlord shall not be liable to Tenant or to any other person for any loss, injury or damage to Tenant, any employee, agent, or guest of Tenant, to the personal property of Tenant or any other person, arising from any cause whatsoever including, without limitation, any acts of negligence, improper construction or failure to repair any building or improvements on the premises.* Tenant hereby agrees to in-

demnify Landlord and hold it harmless from any loss, expense and claims arising out of such damage or injury, nor shall Landlord be liable to Tenant for any loss or damage that may be occasioned by or through the act or omission of other tenants of the premises, or of any other person whatsoever. Tenant further agrees to indemnify and hold Landlord harmless from and against any damage caused by any act or omission by Tenant, employees, agents, or guests of Tenant or caused by the use of the premises by Tenant." (Emphasis added.)

Plaintiff argues in support of the jury's decision that, while Ohio does recognize the validity of an exculpatory clause, it is to be strictly construed against the party seeking to enforce it. As in the case of disclaimer clauses under the UCC, the law also requires that the language of the provision must be clear and conspicuous before it may be enforced.

So long as there is no great disparity of bargaining power between the parties, a commercial lease which clearly and unequivocally relieves the lessor from liability for damages suffered by the lessee resulting even from the lessor's own negligence has been held valid in Ohio on the theory of freedom of contract. *Mansfield Mut. Ins. Co.* v. *Cleveland, Cincinnati, Chicago & St. Louis RR. Co.* (1906), 74 Ohio St. 30; *George H. Dingledy Lumber Co.* v. *Erie RR. Co.* (1921), 102 Ohio St. 236.

Under the circumstances of the case at bar — where (1) both parties were specifically found by the court to be of equal bargaining power, (2) plaintiff's insured was a sophisticated corporation experienced in dealing with leasing agreements for the storage of its customer's property, (3) although the language of the disclaimer did not specifically refer to implied warranties, it could not reasonably be expected to in light of the fact that no such warranty was recognized under Ohio law at the time the provision was drafted, and (4) the limiting language is simple, direct and easily understood — the disclaimer in paragraph three excluding defendant's liability for damages occurring to plaintiff's property while in storage is valid and enforceable. Therefore, in consideration of the valid language of the disclaimer, defendant was not as a matter of law liable for the damages to the property of plaintiff's insured, even if an implied warranty of fitness were recognized in Ohio in commercial lease agreements. Accordingly, defendant's first four assignments of error are sustained.

Defendant's fifth assignment of error deals with the admission of testimony of a prior settlement by defendant of a claim with another tenant for property damaged by leaking water. William Sutterfield, the managing partner of defendant, was called by plaintiff to testify on cross-examination. During his testimony, Sutterfield was asked about an overstuffed chair which was purchased from a tenant. The chair had been damaged while in storage with defendant by water leaking from the walls. Sutterfield's testimony appears in pertinent part as follows:

"Q. (By Mr. Barone) Did you pay a claim for water damage at that facility?

"A. You're talking about the overstuffed chair?

"Q. Yes.

"A. That I described in the deposition?

"Q. Yes,

"A. Yes. That was a bit of damage that resulted from the very specific case that I mentioned to you of the floodlights being improperly mounted on the wall of the building, and when we discovered that problem, we corrected it by calking [*sic*] all of the lighting fixtures, and we did make a settlement with the lady who was a tenant of that space.

"Q. Do you recall what you said at the deposition regarding why you paid her?

"A. I really don't.

"Q. Why did you feel in this situation you should pay the claim and in the situation with the Judds, you shouldn't pay the claim? There is an exculpatory clause like that in the lady's contract, wasn't there?

"A. Yes, that lady signed the same clause."

It is defendant's contention that it was error to allow this testimony to be introduced because it tended to show or admit defendant's liability in regards to plaintiff's claim. Defendant cites Evid. R. 403(A) and 408 in support of its position.

Evid. R. 408 specifically states:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

Evid. R. 408 was written to limit the admissibility of an offer of compromise or of a completed compromise due to considerations that the compromise may have arisen from factors other than liability and that compromises of disputes should be encouraged as a matter of policy. See Staff Note to Evid. R.

408. Moreover, under Evid. R. 408, not only is evidence of a compromise inadmissible but evidence of conduct or statements made in the compromise are also inadmissible.

The testimony of Sutterfield specifically deals with a settlement made with a customer as a result of property damaged while in storage by water. Such testimony clearly falls within the exclusion provided for in Evid. R. 408. Plaintiff argues that the testimony was properly admitted because the claim was not in dispute. Plaintiff points to the fact that Sutterfield admitted that the water damage occurred as a result of improper caulking of the light fixtures on the wall. In addition, plaintiff directs the court's attention to Sutterfield's testimony in response to questioning by his own attorney that the fixtures were not adequately caulked and that defendant felt it was a reasonable thing to do to compensate her for the chair. None of the testimony cited by plaintiff, however, indicates that the claim was undisputed especially in light of the disclaimer clause found in the contract. Not only was it error to admit the evidence of the prior settlement but such evidence was prejudicial to defendant in light of the fact that the jury was instructed to determine if the disclaimer clause in the lease relieved defendant of any liability for water damage. Therefore, defendant's fifth assignment of error is well-taken and is sustained.

In its sixth assignment of error, defendant contends that the referee erroneously considered the deposition of a senior property claim supervisor for plaintiff as to the value of some of the furniture damaged while in storage. Defendant argues that Leroy Balcom's testimony was hearsay and thus inadmissible. At the hearing on damages, plaintiff attempted to offer the deposition of Leroy Balcom as to payments made in the "Harkey" claim and a list of the cost of repairs made in Texas for the

furniture owned by Harkey. The referee, however, chose to reserve his ruling on defendant's objections to the admissibility of the evidence until his final report was released. In his report, the referee specifically found:

"This Referee concludes that the argument and authority given by Plaintiff's counsel, in this regard, is well-taken. It is set forth in his brief as follows:

" 'The testimony of the two adjusters clearly supports the damages paid for two reasons: First, the testimony is not heresay [sic] testimony. The sources of the information relied on by both adjusters to establish the damages were not offered for the purpose of establishing the truth of the information received — it merely establishes the sources upon which the adjusters relied in reaching their estimate of damages. It is up to this Court to determine if that reliance was reasonable. Second, even if the Court feels that it is heresay [sic], it is a well established rule that a witness who is familiar with property and knows prices from secondary sources is competent to testify as to its value. Ohio's position on this issue is set forth in 21 O Jur 2d, Evidence, Sections 474 and 475:

" ' "There is perhaps no class of cases in which opinion testimony is more indispensable than those involving the determination of the value of property, * * *. Opinions of nonexpert witnesses who state, so far as practicable, the facts upon which their opinions are based, will be received on questions of values * * * such as the value of * * * personal property * * *.

" ' "A witness whose testimony indicates that he has been engaged 'in this and similar work' for many years is qualified as an expert to testify as to the market value * * *.

" ' "But opinions as to values are by no means limited to such experts. In general it may be said that witnesses who are familiar with the property in question, and know the prices paid for similar property in the community, by reason either of their having bought and sold similar property, or of their knowledge *from secondary sources,* are competent to testify as to its values." [Emphasis added.]

" 'Furthermore, an expert can testify as to value, even though his conclusions are based in part or entirely on heresay [sic] evidence. *Masheter* v. *C. H. Hooker Trucking Company* (1969), 19 Ohio App. 2d 169 [48 O.O.2d 299], *Westfall* v. *American States Insurance Company* (1974), 43 Ohio App. 2d 176 [72 O.O.2d 400].' "

No mention is made in the referee's report that the list of repairs or statements from other adjusters were admitted as evidence; only the testimony of plaintiff's claims analysts was considered.

Hearsay may not be the basis of an expert opinion, *Drumm* v. *Blue Cross* (1974), 40 Ohio App. 2d 421, 429 [69 O.O.2d 373], nor may an expert base his opinions solely on the opinions or conclusions of another expert, *Cusumano* v. *Pepsi-Cola Bottling Co.* (1967), 9 Ohio App. 2d 105, 113 [38 O.O.2d 132]. Evid. R. 703 states:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

Balcom, in his deposition, testified that he had viewed most of the property listed on the repair sheets; however, he also stated that a significant amount of the property had already been repaired before he had a chance to examine it. Thus, from his own personal observations, Balcom was only able to verify that the property did, in fact, exist and had been restored to what he perceived to be its original condition. Balcom's only means of determining the extent of repairs was by reliance upon the

previous reports of other adjusters from Texas and the list of repairs provided. This court recently found in *St. Paul Fire & Marine Ins. Co.* v. *Ohio Fast Freight, Inc.* (1982), 8 Ohio App. 3d 155, in the first paragraph of the syllabus:

"There is no hearsay exception, either in Evid. R. 803 or 804, that allows a witness to give hearsay testimony of the content of business records based only upon a review of those records."

In *St. Paul,* a traffic manager for Industrial Nucleonics (now Accuray Corporation) testified at trial before a referee that a microscanner owned by Industrial Nucleonics and insured by plaintiff was delivered to Ohio Fast Freight, Inc. for transportation and was returned in a damaged condition. He stated that he personally observed the damage to the scanner but was not personally involved in its repair. Instead, he testified that he reviewed the company records made by the engineering department which listed the new parts required and the necessary repairs and verified the damages to the microscanner in the amount of $8,701.99. The company records relied upon were not introduced into evidence at the trial. An objection was made to his testimony on the basis of hearsay. This court found that, while the witness could properly testify as to the fact of damage to the scanner, he had no personal knowledge of the extent or amount of damages. His only knowledge was based upon his review of the hearsay business records of Industrial Nucleonics. Therefore, his testimony did not provide adequate proof to the extent of damages. In the case at bar, Balcom had neither personal knowledge of the fact of damage nor the extent or amount of damages. He relied exclusively upon the repair list provided to him and the reports of the other adjusters. Neither the reports nor the repair list were properly introduced into evidence as business records. Therefore, Balcom's testimony was erroneously ad-

mitted by the referee and defendant's sixth assignment of error is sustained.

As for defendant's seventh assignment of error, it challenges the referee's reliance upon the testimony of Jerry Frederick, a local claims adjuster for plaintiff, as to the damages sustained in five separate claims filed as a result of the water problems at defendant's storage facility. Defendant argues that Frederick's testimony amounted to merely a summary statement that he had seen the damaged items and that the lesser of the loss of value or costs of repair was paid as represented by several cancelled checks. As previously noted in regard to Balcom's testimony, under Evid. R. 703 an expert may not base his opinion upon hearsay but must rely upon his own personal knowledge or facts and data submitted as evidence in the case. While Frederick did, in fact, view the damaged items before they were repaired, he had no personal knowledge of the condition of the property before it was stored with defendant. He testified that he relied upon inventory sheets to determine the prior condition of the property. The inventory sheets were never properly introduced as business records under Evid. R. 803(6) although defense counsel specifically stated at the hearing that defendants had no objection to the introduction of those documents. Therefore, Frederick did not rely upon hearsay to determine the damages sustained, but, instead, based his opinion upon his own personal observations and the inventory sheets admitted into evidence. Frederick's testimony was properly admitted and considered by the referee. Accordingly, defendant's seventh assignment of error is overruled.

For the foregoing reasons, defendant's first, second, third, fourth, fifth and sixth assignments or error are sustained, and its seventh assignment of error is overruled. The judgment of the

trial court is reversed, and the cause is remanded with instructions to enter judgment in favor of defendant.

*Judgment reversed and cause remanded.*

McCORMAC, P.J., and MOYER, J., concur.