The STATE of Ohio, Appellee,

v.

FOUTY, Appellant.

[Cite as *State v. Fouty* (1996), 110 Ohio App.3d 130.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 95–0041.

Decided March 29, 1996.

*Stephen A. Schumaker,* Clark County Prosecuting Attorney, and *Stephen C. Collins,* Assistant Prosecuting Attorney, for appellee.

*Richard E. Mayhall,* for appellant.

FREDERICK N. YOUNG, Judge.

Michael D. Fouty is appealing his conviction of delinquency by the Clark County Juvenile Court on the grounds of vehicular homicide, R.C. 2903.07. The homicide in this case was the tragic death of Robert Conrad, a fellow student of Fouty's at Tecumseh High School and Fouty's best friend.

The appellee, state of Ohio, did not file a brief.

Fouty was about to drive a van out of the Tecumseh High School parking lot when Conrad and another boy jumped onto the running boards of the van. Conrad was apparently on the passenger side and there was a passenger in the van. Fouty backed up the van with both boys still on the running boards. One boy apparently got off without any trouble. However, after Conrad got off the running board on the passenger side, either by falling or jumping (the evidence does not indicate what exactly happened here), he was found by fellow classmates lying down in the parking lot and having difficulty getting up. He died shortly thereafter. There is also conflicting evidence as to whether Conrad got on the van after it was already moving or was on the van before it started to move. As to the incident, the passenger in the van testified as follows:

"Q. And before you left, where were you at? Were you inside the van?

"A. When we were pulling out to leave or—

"Q. Yes.

"A. Yes. I had just gotten in the van.

"Q. Where at in the van did you get?

"A. Front passenger side seat.

"Q. And before you and Mike [the defendant] left the parking lot area there, did anybody come up to the van?

"A. Not that I seen, no.

"Q. Not that you saw?

"A. No.

"Q. Did you see anybody get on the van?

"A. Not when we were sitting there, no.

"Q. Okay. When did—at any time did you see it?

"A. I didn't see them, no.

"Q. Did you see Mike Brooks jump on the driver's side runner of the van?

"A. No, I didn't.

"Q. Did you see Robert Conrad jump on the passenger side runner?

"A. No, I didn't.

"Q. At any time did you see Robert on the van as it was moving?

"A. Yes.

"Q. And when did you see that?

"A. That was approximately—we were backing up, and it was right as—as the van started to turn, I noticed he was on the van.

"Q. Did—at some time as the van was moving, did you ever notice Matt Brooks on the van?

"A. Mike Brooks?

"Q. Or Mike Brooks?

"A. No.

"Q. You never saw him jump off of the van?

"A. No.

"Q. You did notice Robert—at the time that you noticed Robert, what did you do?

"A. I yelled at him out the window to get off the van.

"Q. You yelled at Robert?

"A. Uh-huh.

"Q. Okay. Did you yell loud to him?

"A. I would assume so, yes.

"Q. Was—at that point in time Michael's sitting beside of you driving?

"A. Yes.

"Q. You said that this is in a curve?

"A.  Yes.  We were parked parallel to the sidewalk, and Mike started to back up.  And then the sidewalk cuts over, and Mike had just started to turn;  and just as he started to turn or maybe a little before is when I noticed Robert.

"Q.  Okay.  And what happened after you hollered to Robert?

"A.  He said something, which I'm not sure what it was;  and he jumped off the van.

"Q.  Did you see what happened after that?

"A.  Yes.

"Q.  What happened?

"A.  He landed on his feet and stumbled backwards, and then he fell;  and he landed—it looked like he took most of the impact on his bottom, and then he fell on his head.

"And then there for a second after, it seemed as if he was okay because he sat back up;  and he grabbed the drumsticks and, you know.  He started the motions as if he was going to get up, and then he laid back down slowly;  and then that's when I told Mike to stop the van."

At the bench trial held before the juvenile court judge on May 17, 1995, the witnesses consisted primarily of the State Highway Patrol troopers who investigated the accident and fellow classmates of Fouty and Conrad who were on the scene at the time.  The key witness for the state, however, was the county coroner, Dr. Dirk Gregory Wood, who was asked to provide an opinion as to the cause of Conrad's death based upon his review of medical records prepared by an assistant.  Counsel for Fouty timely objected on the grounds that none of the records upon which the coroner would presumably be basing his opinion had been admitted into evidence.  It was also brought out during cross-examination that the coroner had not performed an autopsy and had not even personally examined Conrad's body.  The coroner made the following statement under direct examination:  "The cause of death as contained in the certificate of death that I signed on August 24 of '94 was a basilar skull fracture resulting from *a fall* from a moving *truck.*  The manner of death I ruled accidental."  (Emphasis added.)  An alternate cause of death of Conrad was brought out during the cross-examination of Dr. Wood, as follows:

"Q.  Doctor, did you observe any other signs of trauma on the body?

"A.  Yes.  There was trauma about the face, abrasions incident to the fall.  As these weren't causative or material—proximate cause and nature to the cause of death, they were not included on the death certificate.

"Q.  Abrasions on the face were caused by an attempt to intubate him, were they not?

"A. Some of them could have been, but I believe some of them were sustained in breaking his fall.

"Q. The E.R. people intubated him esophageally?

"A. The squad had intubated him, I assume, at the scene and started an intravenous line also.

"Q. Okay. They got—basically they got the tube down the wrong pipe?

"A. Yes.

"Q. And that caused him to vomit?

"A. Could have, yes.

"Q. And it caused him to aspirate or to breathe that vomit?

"A. Yes.

"Q. And that could also be a cause of death, could it not?

"A. It could be.

"Q. Doctor, did you examine any x-ray?

"A. None were taken at the time as he was dead upon arrival.

"Q. Okay. Did you perform an autopsy?

"A. No, I did not.

"Q. Did you examine the body personally?

"A. No, I did not.

"Q. Okay. Any reason you didn't examine the body personally?

"A. My investigator was at the scene. We had full notes from the physician in the emergency room at the time, and the cause of death was seemingly obvious.

"Q. Okay. So you opinion is based strictly on the work of others?

"A. That is correct.

"Q. Have you examined bodies that have sustained injuries as a result of, say, falling from a moving car before in your—in your career?

"A. Yes. Many times.

"Q. If the car was moving, say, 30 miles an hour, is it your experience that the body will have a great number of bruises and abrasions on them?

"A. Yes, they can have.

"Q. But that would be the usual case?

"A. Yes.

"Q. Thank you.

"If the car is moving ten miles an hour, is it your usual experience that the body will also have a significant amount of bruises and abrasions on it?

"A. They can. It's a very variable sign depending on the state and—of the victim—pharmacological status of the victim. It's quite variable, in fact.

"Q. And the only other injuries to Mr. Conrad that you're aware of are some abrasions in the area of his face?

"A. Yes."

After a ten-minute recess at the conclusion of the hearing, the court returned and ruled from the bench, finding that Fouty was negligent in putting a vehicle into motion when somebody was standing on the running board, that Conrad died as a result of falling from the vehicle, and that driving the vehicle was a proximate cause of Conrad's death. The court therefore found Fouty delinquent and subsequently suspended his license to drive for two years, placed him on probation for eight months, fined him $50, ordered him to attend counseling and traffic school, ordered him to perform fifty hours of community service, and ordered him incarcerated for ninety days with eighty days suspended.

On appeal, Fouty presents the following sole assignment of error:

"The trial court committed prejudicial error and abused its discretion when it permitted the Clark County Coroner to express an opinion as to the cause of death of Robert Conrad and admitted that opinion into evidence over appellant's objection."

■ There is no question that the coroner's opinion was based entirely on facts perceived by others and evidence that was not admitted at trial. Evid.R. 703 explicitly provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

■ Even without the application of Evid.R. 703, Ohio courts have consistently held that an opinion of an expert witness, to be admissible, must be based upon facts within the witness's own personal knowledge or upon facts shown by other evidence. *Kraner v. Coastal Tank Lines, Inc.* (1971), 26 Ohio St.2d 59, 55 O.O.2d 68, 269 N.E.2d 43. In *Kraner*, the Supreme Court reaffirmed *Burens v. Indus. Comm.* (1955), 162 Ohio St. 549, 55 O.O. 436, 124 N.E.2d 724, which stated the rule now set forth in Evid.R. 703, paragraph one of the syllabus. In *Kraner*, the Supreme Court was dealing with an opinion by a physician as to "the critical questions pertaining to the causal connection between the accident and the injury." *Kraner* at 60, 55 O.O.2d at 69, 269 N.E.2d at 44. The physician in that case was basing his opinions on a report prepared by another physician which

was not admitted into evidence. The Supreme Court held that the trial court committed prejudicial error in permitting this testimony to be admitted into evidence over objection. Subsequent Supreme Court and appellate court decisions have strictly applied the rule to exclude expert opinion testimony not based upon facts perceived by the expert or admitted into evidence at the trial. See, *e.g., State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, paragraph two of the syllabus; *State v. Jones* (1984), 9 Ohio St.3d 123, 9 OBR 347, 459 N.E.2d 526, syllabus; *State v. Schell* (1984), 13 Ohio App.3d 313, 318, 13 OBR 390, 396, 469 N.E.2d 999, 1005; and *Fireman's Fund Ins. Co. v. BPS Co.* (1985), 23 Ohio App.3d 56, 63–64, 23 OBR 101, 108–109, 491 N.E.2d 365, 373–374.

■ The assignment of error is sustained. Without the coroner's testimony, there is no basis in the record whatsoever to support a finding that Fouty's negligence, even assuming the court was correct in finding it negligence, caused the tragic death of his friend, Conrad. It could just as easily be surmised that Conrad's own negligence in jumping on the running board, or in jumping off it and losing his balance, caused his own death, or that he was asphyxiated during the negligent insertion of the tube by the medical personnel down his throat at the scene of the accident. Without any admissible evidence in the record as to causation, there is no basis to find that Fouty committed the offense of vehicular homicide.

The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

GRADY and BROGAN, JJ., concur.