OPINION
This case involves a commercial lessor's liability for damages caused by the collapse of a brick parapet or facade located on the front of the McAdams Shopping Center. At the time of the collapse, Appellant, Carol Morrow, operated a pet shop in one section of the center. Other tenants included a Family Dollar Store, a Revco drug store, a laundromat, and a beauty parlor. However, only Morrow's claims are the subject of this action.
Morrow appeals from a summary judgment granted to T.I. Lewis, the owner of the center. Originally, Lewis filed a forcible entry and detainer action against Morrow in Clark County Municipal Court, seeking restitution of the premises rented to Morrow, as well as unpaid rent. After Morrow filed an answer and counterclaim for damages, the action was transferred to Clark County Common Pleas Court. The Common Pleas court then granted summary judgment shortly before a scheduled trial.
The collapse of the wall occurred on May 17, 1995, when the entire brick facade of the middle of the shopping center fell forward and collapsed. Damage was not confined to the pet store; rather, a significant part of the shopping center was involved. At the time of the collapse, Morrow was inside the pet store. Although Morrow was not physically injured, she claimed temporary and permanent emotional injuries from the stress and trauma of the accident. She also claimed business losses, because she did not reopen the pet shop after the leased premises were destroyed. In the counterclaim, Morrow alleged that Lewis was responsible for her damages because he negligently maintained the premises.
On October 26, 1998, Lewis filed a motion for summary judgment in the trial court, based on allegations that the cause of the collapse was unknown. The trial court overruled this motion in a brief entry, stating only that material facts were in dispute. Subsequently, the court gave Lewis leave to file an additional or supplemental motion for summary judgment. In the supplemental motion, Lewis focused on the lease provisions and on law relating to the liability of commercial lessors. This time, Lewis was successful in obtaining summary judgment on the counterclaim. As an initial matter, the trial court found that the case did not involve negligence, but instead involved a contractual relationship. In this regard, the court relied on a lease agreement which disclaimed any warranties and relieved the lessor from liability for damages and injury suffered by the lessee, even if the damage resulted from the condition of the premises. As an additional point, the court relied on the fact that under the common law, commercial lessees take leased premises as they find them, with all existing defects that are known or can be found upon reasonable inspection. In this latter regard, the court cited Carol Morrow's knowledge that the exterior building wall leaned.
At the same time the court granted summary judgment, it also let Lewis dismiss his complaint under Civ.R. 41(A), making the summary judgment decision a final, appealable order. Morrow timely appealed, and raises the following assignments of error:
 I. The trial court erred in concluding that the complaint should be dismissed as a result of the shifting of duties under a lease agreement between the parties, where in fact the lease was ambiguous in that regard as the parties had never executed the document.
 II. A landlord who leases commercial property to a tenant has a duty to use reasonable care to maintain it so that neither the building or [sic] any part of it will fall or collapse causing damage or injury to his tenant.
 III. A commercial landlord is not relieved from claims by his tenant for losses and injuries where there is knowledge of a defect in the premises and the tenant and its business are subsequently injured as a result of that defect.
After considering the assignments of error, we find that they have merit. As a result, the summary judgment must be reversed and this case must be remanded for further proceedings. An explanation of our decision follows.
 I
As we noted, the trial court relied on the lease agreement in granting summary judgment. Morrow contends that this was improper because the parties never signed the lease. Our review of this point is de novo, since we are applying the standards used by the trial court. Heinz v. Steffen (1996), 112 Ohio App.3d 174, 183. Summary judgment standards are well established, and allow judgment to be granted if the court finds:
 (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.
 Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,66.
After reviewing the record, we find no disputed issues of fact concerning the lease agreement. However, our conclusion about the effect of the agreement differs significantly from that of the trial court.
According to the undisputed facts, Morrow moved into the rental premises in August, 1994. At that time, she and Lewis agreed that she would paint and redo the floor in exchange for two months' rent. Rent of $500 per month was to begin on October 20, 1994. Neither party testified about how long the lease was to last. Morrow then paid $500 in rent from October, 1994, through April, 1995, except for January's rent, which was either late or not paid, due to slow business. The May, 1995 rent was due three days after the wall collapsed, and was never paid.
Lewis testified that he gave Morrow a rental agreement, and thought it had been signed. However, he never picked up the agreement. Morrow also testified that Lewis gave her a rental agreement. She did not sign the agreement, and no one ever came back to pick it up. The lease agreement submitted to the trial court is type-written and has spaces for the lessee's name, the rental term, and the rental rate. All these spaces are blank. The identity of the leased premises is not even filled in. Additionally, the lease has signature lines for the lessor and lessor, which are also blank.
Morrow and Lewis may have intended to enter into a written agreement at some point. However, the purported lease is invalid and cannot control the rights and obligations of the parties, since it was never signed. Delfino v. Paul Davies Chevrolet, Inc.
(1965), 2 Ohio St.2d 282, 283. In Delfino, the Ohio Supreme Court held that leases that do not comply with the statute of conveyances are invalid and may not be reformed to supply the missing formalities. Id. Likewise, the Statute of Frauds provides that agreements will not be enforced unless they are in writing and are signed by the party to be charged. R.C. 1335.05.
Lewis does not dispute that the parties failed to sign the lease. He contends, however, that if a lessee takes possession under a defectively-executed lease, the tenancy is subject to all the terms of the purported lease except duration. To support this proposition, Lewis cites Baltimore O.R. Co. v. West (1897),57 Ohio St. 161, and Ruben v. S.M. N. Corp. (1993), 83 Ohio App.3d 80,83. These two cases do contain holdings to that effect, but they are distinguishable because the agreements in question were actually signed. Unlike the present case, the defect was not a failure to sign an agreement. Instead, the parties failed to comply with more formal statutory requirements like acknowledgment and recording. We think a significant distinction exists between documents that are executed, but are technically defective, and documents that have not been signed by anyone. See, e.g.,Palladino v. Adv. Sleep Prod. (Feb. 11, 1993), Cuyahoga App. No. 64146, unreported (refusing to enforce alleged lease where parties did not sign a written lease agreement); and Beggin v. Ft. WorthMtge. Corp. (1994), 93 Ohio App.3d 333, 338 (rejecting unsigned lease agreement). As was noted by the Third District in Beggin:
 "[t]here is no substitute for the memorandum as such — or other equivalent writing — as required by the statute of frauds, and the theory once followed in many of the cases in Ohio, to the effect that delivery of possession was equivalent to a written memorandum, is no longer recognized."
 Id. (citation omitted).
The document in the present case was particularly deficient, since it failed to identify essential items like rental rate, rental term, date of commencement of the leasehold, or even the premises being leased. See, id. (indicating that commencement date is an essential term of a lease agreement). There was also no evidence presented about any discussions between Morrow and Lewis of lease terms, other than what was related above, i.e., that Morrow would pay $500 in rent per month. Under the circumstances, the written lease was of no effect.
Moreover, while part performance can validate an agreement and remove it from the statute of conveyances, possession and payment of rent are not enough. Instead, the party relying on the agreement must have taken unequivocal acts which are exclusively referable to the agreement and which "have changed his position to his detriment and make it impossible or impractical to place the parties in statu quo." Delfino, 2 Ohio St.2d 282, paragraph four of the syllabus.
In the present case, neither party took actions which were exclusively referable to the agreement and which detrimentally changed his or her position. To the contrary, Morrow merely occupied the premises and paid monthly rent. Similarly, Lewis simply collected rent. In fact, the specified due date for the rent even conflicts with the lease agreement, which says generally that rent will be due on the first day of the month. Moreover, other actions taken by the parties expressly conflict with terms of the alleged lease. For example, paragraph 7 indicates that no alterations or additions can be made to the premises without the lessor's written consent. However, Morrow removed carpet, built shelving, and put in a fountain without getting written consent. Likewise, paragraph 13 of the alleged lease requires the lessor's prior approval for location and type of outside signs. Nonetheless, Morrow installed outside signs on two different occasions without obtaining approval from Lewis.
Based on the preceding analysis, we agree with Morrow that the trial court erred in relying on the terms of the purported lease agreement. However, this error may be harmless, if Morrow was still barred from recovery under traditional principles governing the commercial lessor/lessee relationship. For resolution of that point, we turn to the second and third assignments of error.
 II
For analytical reasons, we will consider the third assignment of error next. In this assignment of error, Morrow claims that if a commercial landlord has knowledge of a defect in the premises, he is liable for injuries to a tenant that are caused by the defect. By contrast, Lewis says he is not liable for any defects because he was out of possession and control of the leased premises.
Commercial lessors are ordinarily not liable for damages resulting from the condition of leased premises unless they retain possession and control over the premises. Hendrix v. Eighth andWalnut Corp. (1982), 1 Ohio St.3d 205, 206. Further, a lessor who does not retain the right to admit or exclude others from the premises has generally not reserved the degree of possession or control necessary to impose liability for the condition of the premises. Id.
Certain exceptions to this doctrine exist. For example, lessors out of possession and control may agree to make repairs. If they then actually make a repair and do so negligently, they may be liable for injuries that result. Pever v. MeijerProperties, Inc. (Dec. 23, 1993), Hancock App. Nos. 5-92-43 and 5-92-44, unreported, p. 2. Another exception may apply where a defect inherent in the original construction causes an injury. However, if the defect arises after the lease, the tenant is responsible. Shindelbeck v. Moon (1877), 32 Ohio St. 264, 275. Similarly, commercial lessors may be liable in situations involving deceit or an agreement, or where a statute creates liability. Shump v. First Continental-Robinwood Assoc. (1994),71 Ohio St.3d 414, 419. And finally, commercial lessors may be held liable for injuries caused by a failure to keep "common areas" in proper repair. Prendergast v. Ginsburg (1928), 119 Ohio St. 360,363-64, and Davies v. Kelly (1925), 112 Ohio St. 122. In Davies,
the Ohio Supreme Court cited the following rationale for "common areas" liability:
 "[t]he weight of authority, and the only conclusion compatible with common sense, is that where different parts of the same building, or of the same grounds, are let to different tenants, and the landlord retains possession of a portion, the proper reparation of which is necessary to the enjoyment by the different tenants of their different holdings, such as a common hallway, a common stairway, or a common roof, the landlord stands under an obligation to keep such in suitable repair."
 Id. at 132 (citation omitted). The reason for imposing liability, then, is that a landlord is not "out of possession and control" over common areas.
We agree with this rationale. Furthermore, we see no difference between a common roof and the exterior facade of a shopping center that houses several tenants. In either event, repair and maintenance are needed for enjoyment of the premises by all tenants. Expecting an individual tenant to assume liability for damages caused by failure to maintain such an area is unreasonable. Accordingly, the present case fits within the exception for common areas, and Lewis may be held liable for failure to keep the exterior facade and roof in suitable repair. We also note that in a related context, R.C. Chap. 5311 defines "common areas and facilities" as the land described in the declaration, plus (among other things):
 [a]ll other areas, facilities, places, and structures that are not part of a unit, including but not limited to:
 (a) [t]he foundations, columns, girders, beams, supports, supporting walls, roofs, halls, corridors, lobbies, stairs, stairways, fire escapes, entrances, and exists [sic] of buildings.
R.C. 5311.01(B)(1) and (2). Although Chap. 5311 governs condominium property and is not strictly applicable to the present case, it does lend support to the conclusion that "common areas" are parts of leased premises that one would not reasonably expect tenants to control. As was mentioned in Cooper v. Roose (1949),151 Ohio St. 316:
 a presumption [of control by the landlord] does arise where the landlord rents premises to more than one tenant and a portion of the premises is to be used in common by such tenants.
 Id. at 319.
We should make it clear that we are not adopting a theory of implied warranty of fitness, as that has been rejected in Ohio as a potential basis of liability for commercial lessors. SeeFireman's Fund Ins. Co. v. BPS Co. (1985), 23 Ohio App.3d 56. Instead, our decision is based on traditional principles of Ohio law, which hold lessors liable for failure to keep common areas in suitable repair.
Based on the evidence elicited below, we think that, at a minimum, factual issues precluded summary judgment on this point. In this regard, the testimony indicated that the McAdams Center was built between 1960 and 1968. According to Lewis, the center was in excellent condition when he purchased it in 1982. The center housed several stores and had a brick parapet or facade attached to the front of the building. This facade sat on an I-beam across the front of the stores, extended above the roof line of the building, and was higher in the center than on the ends. As designed, the brick facade should have been tied into the face of the building above the beam. The taller part of the facade is the part which collapsed. Additionally, a metal awning or canopy extended outward from the building to protect the sidewalk, and was attached to the building securely enough that people could walk on the canopy. The canopy was about eight feet below the top of the brick facade.
Lewis did not have a manager for the center, nor did he have someone performing maintenance on a regular basis. Instead, when maintenance was needed, Lewis simply hired someone to do the job. Lewis indicated that his tenants were responsible for the inside of their stores, and he was responsible for making sure the outside was properly maintained. Lewis did not pay anyone to inspect the building. However, he was up on the roof "a lot." For example, if tenants complained of leaks, he went up to inspect. About seven years before the accident, a new roof was put on the part of the building covering the Revco store, the pet store, and the laundromat. Lewis also installed a decorative soffit under the canopy about six years before the accident. At times that Lewis was unavailable, his son, Tevin, Jr., took calls. Tevin also did other work for his father in connection with the center, such as painting and arranging for maintenance.
As we mentioned earlier, Carol Morrow moved into the center in August, 1994. Carol's husband, Terry, helped her with various tasks like building shelves and painting. Terry was a self-employed mason contractor, and laid brick for a living. On August 12, 1994, Terry took down the previous tenant's sign from the exterior brick facade and replaced it with a plywood sign advertising the pet store. The weight of the existing sign was 20-25 pounds, and the new sign weighed about ten pounds. When Terry put up the new sign, he drilled six holes in the brick wall and inserted lag bolts one to two inches into the brick. The bolts did not go all the way through the brick. On the day Terry replaced the sign, he noticed that the brick facade on the building was leaning toward the street.
A friend who helped Terry install the new sign also testified that the facade was visibly leaning. The day after the sign was installed, Tevin, Jr., came to the pet store to repair some lights. At that time, Terry told Tevin that the building facade or wall was leaning. In response, Tevin said the wall had been that way for a long time, and "not to worry about it." This conversation was overheard by Rodney Thompson, who was at the pet store to paint. Thompson was a painter by trade, and had been hired by Morrow to help paint the store. A factual dispute exists on the notice issue, as Tevin, Jr., could not recall being told that the building leaned. Both Tevin and his father also denied knowing of any defect in the premises.
Subsequently, on November 4, 1994, Terry took down the plywood sign and installed a new plastic fluorescent sign which weighed 25-30 pounds. At that time, Terry again noticed that the wall was leaning. However, he did not notice any change in its condition since August. Thompson was at the store that day, and helped Terry install the sign. When Thompson went up on the canopy, he was able to see what Terry had been talking about. They had a level, and Thompson estimated that the wall leaned out three or four inches. About two more holes were then drilled for the new sign.
Nothing further happened for about six months, or until May 17, 1995. As we mentioned, on that day, a large part of the brick facade on the entire shopping center suddenly collapsed. The part of the wall which collapsed was above the canopy. In fact, a picture of the scene shows the canopy still standing and mostly intact.
Morrow's expert, Kenneth Crews, viewed the scene within 48 hours after the accident and after repairs were made. He also looked at the blueprints for the building and reviewed deposition testimony. According to Crews, a four-inch lean in the building would have been radical and should have been addressed by a structural engineer. In an affidavit, Crews said that failure to maintain and properly correct the leaning of the wall proximately resulted in the collapse of the wall and the damage to the pet store. Concerning the cause, Crews indicated that the wall was leaning and "obviously bad maintenance" had allowed water to get behind the wall, causing it to collapse. These statements do not completely square with Crew's prior deposition testimony, in which he expressed the opinion that the collapse was possibly a combination of two things: improper maintenance of the flashing, which allowed water buildup behind the facade, and/or a structural problem where the brick was tied into the parapet wall. Nonetheless, inconsistencies between an individual's affidavit and deposition testimony are credibility issues and are not properly disposed of by summary judgment. See, e.g., Torino v. Gem CityVending, Inc. (Apr. 12, 1993), Montgomery App. No. 13592, unreported, p. 4.
 Based on the above facts and factual disputes, summary judgment was not proper. We think enough evidence existed to warrant trial on whether Lewis knew of the defect and failed to maintain the premises in a suitable condition. A landlord must have actual or constructive knowledge of a claimed defect in a common area to be liable, i.e., either the landlord must have knowledge of the defect or "it must have existed for such a length of time that the landlord should have known of it." Young v. Mager
(1974), 41 Ohio App.2d 60, 64. There was evidence that Lewis had notice of the alleged defect, through his son, Tevin. Further, evidence existed, construed most strongly in Morrow's favor, that Lewis failed to maintain the premises in a suitable condition and caused the ensuing damages.
As an aside, we note that Lewis focuses in his brief on our prior decision in Aldridge v. Englewood Village, Ltd. (July 22, 1987), Montgomery App. No. 10251, unreported, which rejected a landlord's liability for injuries sustained by a tenant. Although the trial court did not cite Aldridge, Lewis says the trial court exactly tracked the language in Aldridge. As a result, Lewis feels Aldridge is significant. By contrast, we think Aldridge is irrelevant, since it did not involve an injury caused by a defect in a common area. Id. at p. 2. To the contrary, the residential tenant in Aldridge fell and was injured while walking through her patio door to her own private terrace. Id. at 1. Due to these differing circumstances, we see no reason to consider or applyAldridge.
In light of the preceding discussion, the third assignment of error has merit and is sustained.
 III
The final issue to be resolved concerns the second assignment of error. While this assignment of error is phrased in terms of a landlord's duty of reasonable care, Morrow focuses in the text of her brief on the potential application of res ipsa loquitur. In particular, Morrow argues that, in the absence of explanatory circumstances, negligence should be presumed where a building falls. In this section of the brief, Morrow also generally discusses the elements needed to establish actionable negligence.
Lewis does not respond in detail to the res ipsa loquitur
argument. Instead, Lewis again relies on the general concept that a commercial lessor is not liable for defects in the leased premises. Additionally, Lewis comments that no one knows why the building fell, and that no expert opinion exists concerning the cause of the collapse. He also suggests that Terry Morrow's actions in drilling the wall and installing signs indicated "partial control" of the wall and may have actually caused the wall to collapse.
Taking the latter point first, we note that neither Morrow's expert nor the individual who repaired the building suggested that the installation of a 25-30 pound sign had anything to do with the collapse of a significant part of a shopping center facade six months later. Therefore, while Terry Morrow may have put a sign on the exterior of the building, nothing in the record actually suggests that his actions had anything to do with the collapse of the wall. However, even if the facts were otherwise, we do not need to consider if a presumption of negligence should be applied. As we just mentioned, the evidence raises sufficient factual issues about causation and the lessor's liability, and precludes summary judgment. We also note that the trial court decision did not mention either res ipsa loquitur or presumptions about negligence. In fact, the court rejected negligence as a theory and stated that the relationship between the parties was purely contractual. As we indicated, that was error.
Accordingly, in view of the foregoing discussion, the second assignment of error is overruled to the extent it raises res ipsaloquitur. To the extent that Morrow contends Lewis had a duty to use reasonable care in maintaining the exterior of the building, that part of the assignment of error has merit and is sustained, for the reasons previously discussed.
Based on the preceding discussion, the first and third assignments of error are sustained, and the second assignment of error is sustained in part and overruled in part. The summary judgment decision in favor of Appellee is reversed and this case is remanded for further proceedings.
 _____________________ BROGAN, J.
GRADY, P.J., and WOLFF, J., concur.