Peter KURNCZ, Jr. and Lisa
Kurncz, Plaintiffs,

v.

HONDA NORTH AMERICA, INC., jointly and severally; Honda Motor Company, Ltd., jointly and severally; Honda Research and Development Co., Ltd., jointly and severally; American Honda Motor Co., Inc., jointly and severally; and Honda Research & Development North America, Inc., jointly and severally, Defendants.

No. 1:94:CV:539.

United States District Court,
W.D. Michigan.

April 5, 1996.

Danielle McCluskey–Schink, Simkins & Simkins, P.C., Northville, MI, for plaintiffs.

Robert K. Miller, Bowman and Brooke, Minneapolis, MN, Norma Reddig Gant, Lawrence C. Mann, Bowman & Brooke, Detroit, MI, for Honda North America, Inc., Honda Motor Company, Ltd., Honda Research and Development Co., Ltd., American Honda Motor Co., Inc.

Robert K. Miller, Bowman and Brooke, Minneapolis, MN, for Honda Research & Development North America, Inc.

## *OPINION*

ENSLEN, Chief Judge.

The matter before the Court is defendants' (collectively "Honda's") motion in limine to exclude evidence of hedonic damages.

## .FACTS

While riding a Honda ATC, a three-wheeled recreational vehicle, plaintiff Mr. Kurncz had an accident and sustained injuries, including to his head. Due to his injuries, Mr. Kurncz alleges that he has been denied the enjoyment of life. Mr. Kurncz intends to offer the testimony of Stan Smith, an economist, who will aid the jury in valuating this loss using a "willingness to pay" model. Honda contends that Michigan law does not allow recovery for the type of damage Stan Smith will testify about, and even if it did allow for it, Stan Smith's methodology is unreliable and would be confusing or unhelpful to the jury.

## DISCUSSION

█ The parties do not dispute that Michigan substantive law applies to this action. As such, this Court applies the law as it deems the Michigan Supreme Court would construe it. *See Monette v. AM–7–7 Baking Co.*, 929 F.2d 276, 280 (6th Cir.1991). Federal holdings on Michigan law are persuasive authority. Interpretations of the federal rules of evidence, of course, require consultation of federal authority.

### Recovery for Loss of Enjoyment of Life

This Court applies the Michigan Standard Jury Instructions for matters of substantive Michigan law. For non-economic damages, the Standard Jury Instructions 50.01 and 50.02 provide:

> You should also include each of the following elements of damage which you decide plaintiff is reasonably certain to sustain in the future: .... d. (denial of social pleasure and enjoyments)...."

The denial of enjoyments is considered an element of recovery for pain and suffering. *See* SJI2d 50.02, Note on Use.

█ Honda's first contention is that plaintiffs in Michigan can only recover for the subsequent loss of activities they enjoyed before an injury. This is contrary to the instruction and case law. The instruction and law provide for the *denial* of future enjoyment. *See id.; See also, Beath v. Rapid Ry. Co.*, 119 Mich. 512, 78 N.W. 537 (1899). While Mr. Kurncz cannot *lose* something he never had, he can be *denied* something he never had. *See Beath*, 119 Mich. at 514–17, 78 N.W. 537 (postponement of marriage a compensable harm had it been pled). The question is whether the damages can be proved with some certainty to support a jury verdict, *see Pierce v. New York Central Railroad Co.*, 409 F.2d 1392, 1399 (6th Cir.1969);

or, if the damages are not those which naturally flow from the injury, the question is whether the damage has been properly alleged as well as proved. *See Beath*, 119 Mich. at 514–17, 78 N.W. 537.

For example, the plaintiff who suffers severe and permanent injury to his legs may be compensated for the denial of those activities involving legs that "make life worth living." *Cawood v. Earl Paige & Co.*, 239 Mich. 485, 490, (1927). Such denials are a natural consequence of the injury. The postponement of marriage is a damage peculiar to the plaintiff which does not naturally follow from leg injuries sustained in a train wreck and would require special pleading. *See Beath*, 119 Mich. at 514–17, 78 N.W. 537. In reviewing whether an award was excessive, Courts often look to the evidence of prior enjoyments; but that does not make prior enjoyment of a particular activity a prerequisite to an award for denial of the pleasures of life. *See Paige*, 409 F.2d at 1398–99. Specific activities simply provide the hook on which a Court or jury can hang a value that might otherwise appear high for the circumstances. Mr. Kurncz can recover for the denial of life's pleasures which are the natural consequence of his injuries.

■ The parties agree that the consequences of head injuries are difficult to value. But the mere fact that damages are difficult to estimate does not make them uncompensable. *See Pierce*, 409 F.2d at 1397–98) (quoting *Allison v. Chandler*, 11 Mich. 542, 554–55 (1863).

**Plaintiff's Expert, Mr. Smith**

This brings the Court to the issue of whether to permit Mr. Smith to aid the jury with testimony about his statistical valuations of hedonic loss.

■ In determining whether an expert should testify, this Court must apply Federal Rule of Evidence 702 in keeping with the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–91, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469, 481 (1993), and subsequent Sixth Circuit opinions. *Daubert* establishes a two step test: 1) is the evidence reliable?;

2) is it relevant, i.e., does it "fit" the case? Whether the evidence is reliable scientific evidence involves a four factor test: a) whether the theory can be and has been tested; b) whether the theory has been subject to peer review and published; 3) rate of error and maintenance of standards; 4) general acceptance of the theory in the relevant scientific community. *See id.* 509 U.S. at 591–95, 113 S.Ct. at 2796–97. Whether the evidence is relevant refers to whether or not the evidence will assist the jury in determining the existence of any fact of consequence. *See id.* at 591–93, 113 S.Ct. at 2796 (referring to Fed.R.Evid. 401 and 402).

■ Of course, assuming all of the above, the evidence still must meet the requirements of Rule 403. *See id.* at 595–97, 113 S.Ct. at 2798. All evidence must meet Rule 403.

■ Mr. Smith is an economist and President of Financial Group, Ltd. He has a method for calculating the value of life according to a "willingness to pay" model. He bases his calculations on three underlying studies: 1) consumer behavior and purchases of safety devices; 2) wage risk premiums; 3) regulatory cost-benefit analyses. The idea is that decisions in the aggregate, or collective societal decisions, which actually intersect money and risks to life and limb can be used to determine a statistical figure for the value society places on life. A jury can then employ that figure as a benchmark of some kind in assessing the particular loss in the case before it.

The willingness to pay model on the issue of calculating hedonic damages is a troubled science in the courtroom, with the vast majority of published opinions rejecting the evidence. *See Ayers v. Robinson*, 887 F.Supp. 1049 (N.D.Ill.1995); *Hein v. Merck & Co., Inc.*, 868 F.Supp. 230 (M.D.Tenn.1994); *Sullivan v. Gypsum Co.*, 862 F.Supp. 317 (D.Kan.1994); *Mercado v. Ahmed*, 756 F.Supp. 1097 (N.D.Ill.1991), *aff'd*, 974 F.2d 863 (7th Cir.1992); *Sterner v. Wesley College, Inc.*, 747 F.Supp. 263 (D.Del.1990); *Patch v. Glover*, 248 Ill.App.3d 562, 618 N.E.2d 583, 188 Ill.Dec. 13 (Ill.App. 1 Dist.1993). *But see, Sherrod v. Berry*, 629 F.Supp. 159 (N.D.Ill.1985), *aff'd*, 827 F.2d 195 (7th Cir.

1987), *vacated and remanded on other grounds*, 835 F.2d 1222 (7th Cir.1988).

In *Ayers*, 887 F.Supp. at 1049–66, one of the few post-*Daubert* opinions on Mr. Smith's approach, the Court thoughtfully reviewed the technique and concluded the approach was neither reliable nor "fit" under Rule 702, and was too prejudicial under Rule 403. The reliability and "fit" problems included: the disagreement among scientists regarding benchmark figures for beginning to calculate the value of a statistical life; the problems adjusting the statistical life figure to the individual plaintiff; problems with the underlying assumption of willingness to pay that the decisions are consciously motivated by bona-fide safety interests; problems with the assumption that people accurately perceive risk and the degree of harm from the risk. *See id.* at 1059–64. Another post-*Daubert* opinion, *Hein*, 868 F.Supp. at 230–35, also found that the willingness to pay model fails the *Daubert* test for similar reasons.

First, *Daubert* asks a Court to inquire whether a method can be or has been validated. Some predictions or assumptions of economists can be validated at least in retrospect; e.g., life expectancy, inflation, etc. This is not true for valuation of hedonic damages. *See* Parker Cashdollar and Marsha Cope Hute, *Reliability and Validity of Hedonic Damage Testimony: Judicial Logic about Science in Merrell Dow and Mercado*, 3–DEC J. Legal Econ. 57, 67 (1993) (approvingly cited in *Hein*, 868 F.Supp. at 232 n. 8). The "[s]peculative assumptions remain speculation." *Hein*, 868 F.Supp. at 232.

The model assumes people consciously consider and accurately evaluate the risks they face and the degree of harm from the risks when making purchases or choosing a job. The method assumes freedom of choice. For example, how much freedom to choose did those people in high risk jobs actually have? The method assumes risk calculation governs decision-making. For example, do people choose to be police officers necessarily because they value their own lives less or might not civic pride play a role? If civic pride plays a role, what does that do to the calculation of increased pay for increasingly dangerous jobs? Another example is that of seatbelts. People decline to wear them despite knowing the risks. Do they do this because they value life less or because they simply do not think they will get into an accident?

The second *Daubert* factor inquires whether the method has been subject to peer review and published. Mr. Smith's method has been subject to peer review and he is well published. The peer review, however, has not led to general acceptance—the fourth factor. "[T]here is no basic agreement among economists as to what elements ought to go into the life evaluation. There is no unanimity on which studies ought to be considered." *Mercado*, 756 F.Supp. at 1103. *Accord, Ayers*, 887 F.Supp. at 1059–61 (reviewing various benchmark figures from economists); Cashdollar and Hute, *supra*, at 70. Mr. Smith's use of regulatory statistics has been specifically criticized. *See Ayers*, 887 F.Supp. at 1061 n. 4.

Similarly, there is a certain "eyeballing" in selecting a statistical life value from the broad range of values that a study might reveal. "Eyeballing may have the advantage of ease, but it certainly lacks scientific reliability in the sense of producing consistent results...." *Id.* (citing *Daubert*). Consequently, experts disagree. *See id.* at 1060–61. Plaintiffs offer the affidavits or letters of three other experts who testify in this field who believe Mr. Smith's approach is generally accepted. The general approach may be accepted by economists, but not the specific choices or the reasons for the specific choices within the methodology. *See* Cashdollar and Hute, *supra*, at 70; *Ayers*, 887 F.Supp. at 1061–63.

The remaining factor the Court should consider is the rate of error. Economists' studies have varied tremendously in their valuations, arriving at figures as disparate as $100,000.00 and $12,000,000.00. *See Hein*, 868 F.Supp. at 233 n. 15–16. *See also, Ayers*, 887 F.Supp. at 1061. In the government regulation arena, the figures have varied between $70,000.00 (Consumer Product Safety Commission figure for regulation governing space heaters) and $132,000,000.00 (Food and Drug Administration figure governing regulation for banning DES in cattle feed). *See Ayers*, 887 F.Supp. at 1061 n. 4.

Mr. Smith uses figures from Ted Miller, *The Plausible Range for the Value of Life— Red Herrings Among the Mackeral*, J. Forensic Econ. 3(3) 17 (1990). The study found life is valued at between 1.5 and 3 million dollars. Based on a survey of only 72 students at the University of Oregon, the "Plausible Range" study figured that the error rate among people in assessing risk was about 20%. The Court can find no testing of that figure. The "Plausible Range" report was criticized by the *Ayers* Court as "a prime candidate for an Oscar in the most-misleading-title category." *See* 887 F.Supp. at 1061. Mr. Smith chooses the mean, 2.2 million dollars. This is an eyeballed choice.

The second step in the analysis is whether the evidence "fits" the task faced by the jurors. Assuming liability, the jurors must place a value on the loss faced by Mr. Kurncz due to his accident. The "willingness to pay" theory establishes a statistical value based on anonymous lives. While the statistical approach may be useful for writing regulations, courts have found it rather "callous and unhelpful" for jurors assessing individual lives. *Hein*, 868 F.Supp. at 233. The use of a statistical person is not necessarily inappropriate, but in the end, Mr. Smith's method is nothing more than a compilation of lay responses. Giving the jury a number based on lay preferences in and of itself is no more helpful or appropriate than informing them of other jury verdicts or of the gallery's preferences. *Mercado*, 756 F.Supp. at 1103, *aff'd*, 974 F.2d at 871. I suppose the method of thinking might be helpful, but jurors are seldom economists. Given that courts, accustomed to handling technical problems (e.g. patent litigation), struggle to follow all of the adjustments involved in "willingness to pay" calculations, *see Ayers*, 887 F.Supp. at 1060, the Court does not believe the jurors would accept the method so much as they might latch onto the first expert figure lobbed their way. *See* Fed.R.Evid. 403.

The task faced by the jurors is defined by the instruction they will be given. It appears to the Court that Mr. Smith's testimony does not "fit" that task within the meaning of Rule 702 and would be unduly prejudicial under Rule 403.

There is a danger of double counting with this evidence. The "willingness to pay" model values life or the enjoyment of life according to how much people are willing to pay for safer living. To explain again by way of example, a person may pay extra for a guard rail on an auger to reduce the risk of injury. The Rule 403 and helpfulness problem here is that the person buying a guard rail for his auger is probably going to take into consideration not only that he enjoys the use of his arms, but also that getting a limb torn-off would hurt. Yet, under the Michigan jury instructions, enjoyment of life's pleasures is but one form of non-economic losses to be considered along with physical pain and suffering. It would be quite difficult for the jury to assess how much physical pain and suffering have already been taken into consideration in the statistical life value. Similarly, some safety decisions behind the statistics may be quite individualized and thus overlap those in the case before the jury. A person might purchase a helmet because she knows a head injury engenders loss of a lot if things, including her sense of humor. So how much has lost sense of humor already been taken into consideration in the statistical life value?

In this way, Mr. Smith's method and arrival at a number or range of numbers invites the jury to abandon its own perceptions of what is important to the particular case and its value in favor of guess-work as to how much his figures have already taken those factors into consideration.

Finally, Rule 403 takes into account such matters as waste of time and general confusion of the issues, not to mention unfair prejudice. Where there is so much flux in the applicable "science", much time will be spent debating its merits. Where the case itself does not turn on the issue, jurors traditionally have done without the evidence, and the Court will be instructing the jurors that they need not accept any expert's opinion anyway, the time will not be well spent. The methodology debate may simply confuse the issues. As mentioned above, there is also the opposite danger that the serious debate on the merits of the method will not confuse the jurors but will pass over their heads

entirely, and they will simply accept the number because it has the sanction of an expert.

Should defendants be found liable, the task the jurors will face in calculating damages is the same daunting task jurors have faced since the dawn of tort law. Providing them with a misleading and confusing tool, however appealing its prospects, is not the answer.

## CONCLUSION

The loss or denial of hedonic, or enjoyment of life, values is compensable under Michigan law. The Court will so instruct the jury. But, the Court concludes that the balance of the applicable factors weigh against finding Mr. Smith's "willingness to pay" testimony is reliable and helpful within the meaning of *Daubert* and Fed.R.Evid. 702. While it may be sufficient science for passing regulations, it is poor science for the courtroom. Even if the evidence were not to be analyzed under Rule 702, it would fail Rule 403.

## *ORDER*

In accordance with the Opinion entered on this date;

**IT IS HEREBY ORDERED** that defendants' motion in limine to exclude evidence of hedonic damages (dkt. # 108) is **DENIED in part and GRANTED in part.**

The motion is **denied** to the extent that the denial or loss of the pleasures of life, hedonic loss, is recoverable under Michigan law. The motion is **granted** to the extent that plaintiffs' expert cannot testify to the "willingness to pay" method of calculating this loss.