**LEWIS et al., Appellees and Cross–Appellants,**

**v.**

**ALFA LAVAL SEPARATION, INC., Appellant and Cross–Appellee.**

[Cite as *Lewis v. Alfa Laval Separation, Inc.* (1998), 128 Ohio App.3d 200.]

Court of Appeals of Ohio,
Fourth District, Lawrence County.

No. 96 CA 44.

Decided June 4, 1998.

202

---

*Angela L. Green,* for appellees and cross-appellants.

*Buckingham, Doolittle & Burroughs, Donald A. Powell* and *Robert T. Tucker,* for appellant and cross-appellee.

---

PETER B. ABELE, Judge.

This is an appeal from a judgment entered by the Lawrence County Common Pleas Court after a jury trial. The jury awarded Russell G. Lewis and his wife, Minnie Lewis, plaintiffs below and appellees/cross-appellants herein, $650,000 from Alfa Laval Separation, Inc., defendant below and appellant/cross-appellee herein, for injuries he received as a result of an October 24, 1993 explosion of a centrifuge at Ashland Oil Company's South Point Ethanol Plant.

Appellant/cross-appellee (hereinafter "appellant") assign the following errors:

"First Assignment of Error:

"The trial court erred in granting the plaintiffs' motion in limine prohibiting defendant from introducing evidence of plaintiff's contributory negligence in failing to wear mandatory hearing protection.

"Second Assignment of Error:

"The trial court erred in permitting plaintiffs to introduce evidence of a settlement of the claims of South Point Ethanol.

"Third Assignment of Error:

"The trial court erred in permitting plaintiffs to elicit expert testimony from their economist on the monetary value of plaintiff's loss of enjoyment of life's pleasurable activities.

"Fourth Assignment of Error:

"The trial court erred in failing to instruct the jury to limit its consideration of medical expenses incurred by the plaintiffs to those documented in plaintiff's medical exhibit binder."

Appellees/cross-appellants (hereinafter "appellee") assign the following errors:

"First Assignment of Error:

"The trial court erred in granting defendant's motion for directed verdict on the plaintiff's punitive damages claim.

"Second Assignment of Error:

"The trial court erred in denying plaintiffs' motion for prejudgment interest."

On December 16, 1994, appellee filed the instant complaint. In the complaint, appellee alleged that while he was working at Ashland Oil Company's South Point Ethanol Plant on October 24, 1993, he suffered severe injuries, including permanent damage to his ear and auditory system. The injuries occurred when a Model D–7500 centrifuge manufactured and repaired by appellant exploded with such force that the extension portion of the centrifuge was thrown straight up through the roof of the plant and hot corn mash was forcibly blown into appellee's ear.

On January 24, 1995, appellant filed an answer which, *inter alia,* raised the affirmative defenses of comparative negligence and assumption of risk. On September 13, 1995, appellee amended the complaint by adding a claim for punitive damages. During the next year, the parties engaged in extensive discovery proceedings, including over thirty depositions.

On October 2, 1996, appellee filed a motion *in limine* requesting the trial court to prohibit appellant from introducing or referring to any evidence regarding hearing protection. On October 7, 1996, appellant filed a memorandum in opposition to appellee's motion *in limine.* The trial court granted the motion *in limine.*

On October 21, 1996, the first day of the jury trial, appellant filed a motion *in limine* requesting the trial court to prohibit appellee from introducing any testimony regarding hedonic damages. When denying the motion, the trial court commented that the "testimony here goes to the credibility or weight to be given to the evidence of Dr. Brookshire." During the trial, Dr. Brookshire, an economist, testified that because our country values a life at $3,500,000, because that $3,500,000 amount minus the $900,000 worth of wages that an average

American will earn is $2,600,000, because that $2,600,000 amount spread over appellee's life is $77,000 per year, and because another expert witness testified that appellee has lost approximately six percent to nine percent of his functioning, appellee has lost approximately $4,000 to $5,000 per year for the rest of his life due to his injuries.

At the conclusion of appellee's case, appellant moved for a directed verdict on the issue of punitive damages. The trial court granted the motion.

On October 25, 1996, the jury returned a $650,000 verdict in favor of appellee. On October 31, 1996, the trial court entered judgment in accordance with verdict.

On November 15, 1996, appellee filed a motion for prejudgment interest. Appellant filed a memorandum in opposition to appellee's motion for prejudgment interest. On November 26, 1996, appellee filed a reply memorandum. On December 3, 1996, the trial court denied appellee's motion for prejudgment interest.

Appellant filed a timely notice of appeal. Appellee filed a timely notice of cross-appeal.

I

In its first assignment of error, appellant asserts that the trial court erred by granting appellee's motion *in limine* prohibiting appellant from introducing evidence of the fact that appellee failed to wear mandatory foam-style hearing protection at the time of the accident. Appellant contends that the evidence is relevant to the defenses of comparative negligence and assumption of risk. Appellant contends that appellee's otolaryngologist Dr. Wolfe, in his deposition, noted that it is possible that use of the mandatory hearing protection would have prevented appellee's injury.

Appellee argues that the trial court did not abuse its discretion by prohibiting admission of the hearing protection evidence. Appellee notes that the hearing protection evidence was irrelevant and confusing. Appellee notes that Dr. Wolfe did not testify that the hearing protection would have saved appellee from injury; rather, Dr. Wolfe testified in his deposition that he did not know whether use of the hearing protection would have prevented the injury to appellee's ear. Appellee further argues that regardless of whether appellee failed to use mandatory hearing protection, because appellee did not voluntarily assume a known risk, the assumption of risk defense would fail.

Initially, we note that the admission or exclusion of relevant evidence is within the sound discretion of the trial court. The trial court's decision to admit or exclude relevant evidence cannot be reversed absent an abuse of discretion. *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056, 1058;

*Leaman v. Coles* (1996), 115 Ohio App.3d 627, 629, 685 N.E.2d 1294, 1296; *Nielsen v. Meeker* (1996), 112 Ohio App.3d 448, 450, 679 N.E.2d 28, 30. An abuse of discretion connotes more than an error of law or judgment. In *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126–127, 482 N.E.2d 1248, 1252, the court wrote as follows that an abuse of discretion involves a result "palpably and grossly violative of fact and logic":

"The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias."

Thus, an abuse of discretion will not be found when the reviewing court simply could maintain a different opinion were it deciding the issue *de novo*. Rather, an abuse of discretion indicates an attitude that is unreasonable, arbitrary, or unconscionable. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601.

In the case *sub judice*, we find no abuse of discretion with the trial court's decision to exclude evidence that appellee failed to wear mandatory foam-style hearing protection. In his deposition, Dr. Wolfe testified in part as follows:

"Q. You mentioned hearing protection. Are you familiar with a hearing protection device that is a sponge-like insert that you squeeze and then place into your external canal?

"A. Yes.

"Q. Are you aware of—of what these sort of hearing devices are designed and required to do?

"A. Yes.

"Q. And what is that?

"A. Protect the inner ear from excessive noise.

"Q. Would they protect from explosions or traumas not involving noise?

"A. They're not designed for that.

"Q. I'm going to ask you to assume that Mr. Lewis, at the time of the explosion, would have been wearing one of the sponge-like inserts that I just described to you, and I'm going to ask you to assume further that the centrifuge exploded with a force such that it drilled the corn mash that you observed and imbedded the corn mash into—to his ear with a force that blew the machine

through the plant roof, okay? Would that sponge-plug have become jammed, at some point, in his ear or some part of his ear?

"A. I—I don't know what would have happened. Certainly, those foam plugs are compressible. They are—their intent and purpose is not to protect somebody from an· explosion. Their intent and purpose is to protect somebody from harmful noise levels.

"How much that would have buffeted what went in his ear or whether that would have simply been blown in and it been blown [sic] through the eardrum, I do not know.

" * * *

"Q. If I understood your testimony earlier today, I believe you said that you are unable to give any opinion within a reasonable degree of medical certainty as to what would have happened if Mr. Lewis had been wearing the foam-style hearing protection devices; is that correct?

"A. That—that is correct. I can speculate, as I did.

"Q. But you could not—

"A. (Interposing) But—

"Q. (Continuing) —give me an opinion within a reasonable degree of medical certainty—

"A. (Interposing) But I cannot say for certain whether it would have blunted the force, whether it would have simply become another missile going into the inside of his ear." ·

Although Dr. Wolfe testified that it is possible that use of the foam-style ear inserts would have protected appellee from injury, he also testified that he did not know whether use of the inserts would have prevented or worsened appellee's injuries. Dr. Wolfe readily admitted the speculative nature of his testimony. Because appellant presented no evidence that use of the inserts would have prevented or lessened appellee's injuries, we find nothing unreasonable, arbitrary, or unconscionable with the trial court's decision to exclude evidence that appellee failed to wear the inserts.

Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

## II

In its second assignment of error, appellant asserts that the trial court erred by permitting appellee to introduce evidence that South Point Ethanol

settled its claims against appellant regarding the centrifuge explosion that injured appellee. Appellant objected during the following testimony at trial:

"Q. Did South Point Ethanol hire an engineering firm to come in and try to find out why this, that unit failed?

"A. Yes, Ma'am.

" * * *

"Q. Based upon the engineer's findings, did South Point Ethanol file a lawsuit against the defendant alleging that the centrifuge was defective?

"POWELL: Objection, Your Honor.

"COURT: Overruled. You may answer.

"A. Yes, Ma'am.

"Q. Where was this lawsuit filed?

"A. Here in Lawrence County.

"Q. When was the trial scheduled?

"A. Today.

"Q. Is South Point Ethanol going to present any evidence at trial today?

"A. No, Ma'am.

"Q. Why is that?

"A. *We have reached a settlement.*

"Q. Thank you. That's all I have." (Emphasis added.)

Thus, the trial court permitted testimony of the fact that a settlement occurred in the lawsuit that South Point Ethanol brought against appellant. Appellant cites *Fireman's Fund Ins. Co. v. BPS Co.* (1985), 23 Ohio App.3d 56, 23 OBR 101, 491 N.E.2d 365, for the proposition that Evid.R. 408 prohibits evidence concerning the settlement of claims between a party and a nonparty to the lawsuit in question.

Appellee argues that Evid.R. 408 permits the introduction of evidence of the mere fact that a party has reached a settlement. Such evidence does not violate the rule's purpose, which is to prohibit evidence tending to demonstrate fault. Appellee further argues that in the case *sub judice,* the evidence of the fact that appellant reached a settlement with South Point Ethanol explains why pieces of evidence were unavailable to appellant's expert Dr. McCarthy, explains why South Point Ethanol is not a party to the case, and explains South Point Ethanol's lack of motivation to be forthright concerning the investigation it conducted after the explosion.

Appellant replies to appellee's arguments by alleging that appellee used the settlement evidence at trial to bolster the credibility of his own witness.

Evid.R. 408 provides in part as follows:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. * * * This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

■ The rule forbids evidence of a settlement when that evidence is presented "to prove liability for or invalidity of the claim or its amount." The rule applies not only to evidence of a settlement between the parties, but also to evidence of a settlement between a party and a nonparty. *Fireman's Fund Ins. Co. v. BPS Co.*, 23 Ohio App.3d 56, 23 OBR 101, 491 N.E.2d 365.

The rule, however, expressly permits evidence of a settlement when that evidence is presented for a purpose other than proving "liability for or invalidity of the claim." In *Shimola v. Cleveland* (1992), 89 Ohio App.3d 505, 511, 625 N.E.2d 626, 630, the court permitted evidence of a mandamus action brought by the plaintiff against the defendant. The court reasoned that the mandamus action evidence outlined the history of the relocation of the house that was the subject of the action. In *Mark v. Mellott Mfg. Co.* (1995), 106 Ohio App.3d 571, 666 N.E.2d 631, we permitted evidence of an informal settlement agreement between the defendant and the United States Occupational Safety and Health Administration, which evidence the plaintiff presented for the purpose of proving proximate cause. In *Scott v. Braun* (Nov. 22, 1995), Jefferson App. No. 94–J–13, unreported, 1995 WL 697836, after the appellant claimed that the appellee was the sole proximate cause of the accident, the court permitted the appellee to impeach the appellant with evidence that the appellant had filed a claim against a third party. In *Owens–Corning Fiberglas Corp. v. Am. Centennial Ins. Co.* (C.P.1995), 74 Ohio Misc.2d 272, 660 N.E.2d 828, after the plaintiff argued that "it is well established in other jurisdictions that evidence of settlement between a party and one or more nonparties is admissible if necessary for the jury to understand why nonparties who would be expected to be at trial are not at trial," the court permitted the plaintiff to introduce evidence of such a settlement.

In the case *sub judice*, appellee presented evidence of the settlement between appellant and South Point Ethanol for several purposes other than proving "liability for or invalidity of the claim." Appellee presented the evidence to

explain why pieces of evidence were unavailable to appellant's expert Dr. McCarthy, to explain why South Point Ethanol is not a party to the case, and to explain South Point Ethanol's lack of motivation to be forthright concerning the investigation it conducted after the explosion. Because appellee presented the evidence for a purpose other than proving "liability for or invalidity of the claim," we find no abuse of discretion with the trial court's decision to admit the evidence.

Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

### III

In its third assignment of error, appellant asserts that the trial court erred by permitting appellee to elicit expert testimony from his economist on the monetary value of appellee's loss of enjoyment of life's pleasurable activities. In support of this assertion, appellant cites federal court decisions excluding such evidence. Appellant claims that the expert testimony from economist Dr. Michael Brookshire in the case *sub judice* fails both parts of the test enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, for use in determining the admissibility of expert testimony. Appellant additionally argues that Dr. Brookshire's testimony does not assist the trier of fact in making its decision. In this regard, appellant cites Evid.R. 702. Appellant claims that Dr. Brookshire's testimony is more prejudicial than probative. Appellant also claims that Dr. Brookshire's testimony invades the province of the jury.

Appellee, in response, notes that appellant failed to object to Dr. Brookshire's testimony. Appellee additionally notes that many scholars have accepted the willingness-to-pay methodology of determining the monetary value of the loss of use and enjoyment of life. Appellee argues that appellant's arguments under this assignment of error address the weight, not the admissibility, of Dr. Brookshire's testimony.

In reply, appellant argues that although no Ohio cases have either allowed or disallowed testimony similar to Dr. Brookshire's testimony, federal courts have disallowed such testimony. Appellant further argues that appellee, by stating that the testimony was of some assistance "in asking a jury to do what appears to be the impossible—quantify something which cannot truly be determined, that is the value of human life," admitted that Dr. Brookshire's testimony attempts to quantify something which cannot be quantified.

Initially, we will address appellee's argument that appellant failed to object to Dr. Brookshire's testimony. Although appellant did not raise an objection to Dr. Brookshire's testimony during the playing of his videotaped

deposition at trial, appellant did raise an objection prior to the playing of the videotape. The trial court permitted appellant to make the objection early rather than to interrupt the playing of the videotaped deposition. For this reason, we reject appellee's argument that appellant failed to raise an objection to Dr. Brookshire's testimony on the monetary value of appellee's loss of enjoyment of life's pleasurable activities.

Next, we note that in *Fantozzi v. Sandusky Cement Products Co.* (1992), 64 Ohio St.3d 601, 597 N.E.2d 474, paragraph two of the syllabus, the court permitted recovery for "loss of ability to perform the plaintiff's usual functions." The court specified that these damages include damages for loss of enjoyment of life. The court defined "hedonic damages" as being damages to compensate the plaintiff for the "inability to perform the usual activities of life that have actually provided distinct pleasure" to the plaintiff. *Id.*, 64 Ohio St.3d at 614, 597 N.E.2d at 484. In *Ramos v. Kuzas* (1992), 65 Ohio St.3d 42, 43, 600 N.E.2d 241, 243, the court summarized *Fantozzi* in part as follows:

"In *Fantozzi*, we observed that the 'loss of ability to perform the plaintiff's usual functions' (*i.e.*, loss of enjoyment of life) damages can be categorized as either 'basic' or 'hedonic' in form. 'Basic losses' or disability losses include the inability to perform the basic mechanical body movements of walking, climbing stairs, feeding oneself, and driving a car. 64 Ohio St.3d at 614–615, 597 N.E.2d at 484–485. 'Hedonic losses' include the inability to perform the plaintiff's usual specific activities which had given pleasure to this particular plaintiff, such as playing golf, dancing, bowling, playing musical instruments, and engaging in specific outdoor sports."

In *Ramos*, the court held that because a newborn injured in utero or at birth has not had adequate time to develop an ability to perform a pleasurable activity or hobby specific to his or her lifestyle, a newborn cannot suffer hedonic damages.

In the case *sub judice*, appellee presented Dr. Brookshire's testimony by videotape concerning his calculations of the monetary value of appellee's loss of enjoyment of life's pleasurable activities. Dr. Brookshire testified that he wrote Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys in 1990 and that he supplemented that book annually through 1993.[1] Dr. Brookshire testified in pertinent part as follows concerning the willingness-to-pay

---

1. In *Ayers v. Robinson* (N.D.Ill.1995), 887 F.Supp. 1049, the court commented that the hedonic damages expert witness in that case, Stan Smith, co-authored Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys (1990 with 1992–1993 cum. supp.) with Michael Brookshire.

methodology he used to calculate the monetary value of appellee's loss of enjoyment of life's pleasurable activities:

"Q. How long have economists studied the value of human life?

"A. The first economics book was written in 1776 by an economist in England named Adam Smith, it was called the 'Wealth of Nations,' and in that very first textbook he talks about what we call compensating wage differentials. He said, and this is the whole basis of the theory we're talking about, he said whatever you have to pay a worker to be a common laborer above the ground, you have to pay them more money to do the same job a mile under the ground in a coal mine. And they had coal mines in England at that time. That difference, the reason you have to pay them more money is because there is a higher risk of death working in a coal mine than working on top of the ground. I like to use skyscrapers. They would have to pay me a lot of money to wash windows on the top of the 24th skyscraper. They would pay me a lot less if I just got to do it on the first floor. * * *

" * * *

"A. * * * [W]e have to take large samples of Americans working in less risky jobs or more risky jobs, we have to look at all the U.S. Government agencies, who now have to report how they value a human life. * * * [I]n this country right now, the best conservative estimate of how we value the American life is 3 1/2 million dollars. We are willing to pay 3 1/2 million dollars. The government is willing to make companies pay 3 1/2 million dollars in safety to preserve one human life. * * * For an average American the average value of those economic machine earnings are a little over $900,000 in present value. * * * We get 2.6 million dollars is what we're willing to pay in this country to preserve those parts of our lives that have nothing to do with our role as an economic machine. * * * When you spread that over the life of Mr. Lewis, that value per year is $77,000.00 a year. Now, that's as if he lost all of the enjoyments of life, as if he had died. He didn't die, he has got injuries. Doctor Parsons, the Clinical Psychologist, tell [sic] me age by age what portion of that value of life this man has lost because he cannot function on average, he cannot function usually and normally, and that varies from 6% to 9%. So what I'm going to do is project 6 to 9% of the $77,000.00 average value, and that's only $4,000 to $5,000 a year. What we're ending up saying, based on Doctor Parsons, is that he has lost not the job part, not the earning capacity, not the household services, he has lost $4,000.00 to $5,000.00 a year because he cannot function on average based on Americans on average in terms of how they and our government value a human life when it can function usually and normally. * * *

" * * *

"A. When you take that annual benchmark value of 77,000 and you apply the 6 to 9% from Doctor Parsons, and when we do that present value, remember the discounting, because we still have to lower those numbers down to a present value, the loss, in my opinion is $143,639.00."

When asked to explain in more detail how he calculated the figure, Dr. Brookshire explained that almost one hundred published economic articles support his methodology, that the Occupational Safety and Health Administration values a human life at two million dollars, and that the Nuclear Regulatory Commission values a human life at five million dollars. Dr. Brookshire also explained that his $143,000 estimate "is based on a lot of science." Dr. Brookshire reasoned that because the state of Ohio willingly pays $34,381.00 per year to house a maximum security prisoner, we are "willing to pay * * * $34,381.00 to keep alive the worst of us." That prisoner amount is forty-five percent of the $77,000 per year amount that Dr. Brookshire calculated as the noneconomic value of appellee's life.

Appellant contends that Dr. Brookshire's testimony does not satisfy the two-part admissibility test enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Prior to the enactment of Evid.R. 702, courts could admit scientific evidence only if it had gained "general acceptance" in the relevant scientific community. The *Daubert* court held that under Fed.Evid.R. 702, expert scientific evidence is admissible if the trial court determines that the evidence is both reliable and relevant. The *Daubert* court wrote in part as follows:

"Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(A), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test."

In *State v. Clark* (1995), 101 Ohio App.3d 389, 414, 655 N.E.2d 795, 810–811, discretionary appeal not allowed in (1995), 72 Ohio St.3d 1548, 650 N.E.2d 1367, the court summarized as follows the reliability half of the two-part test enunciated in *Daubert:*

"In *Daubert,* the Supreme Court set forth various guidelines to assist the trier of fact in determining whether the evidence is based on 'scientific knowledge.' The court explained that the trial court must engage in a preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in

issue. Key questions for resolution by the trial court include: whether the reasoning or methodology has been tested; whether the theory or technique has been subject to peer review and publication; considerations of the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and, finally, consideration of whether the methods or techniques have gained 'general acceptance' should be considered." See, also, *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 687 N.E.2d 735. Pursuant to *Daubert*, the trial court now serves as a gatekeeper who determines whether disputed evidence is scientific and whether it will assist the trier of fact. In *Wilson v. Chicago* (C.A.7, 1993), 6 F.3d 1233, 1238, the court characterized this gatekeeping function as "the responsibility for keeping 'junk science' out of the courtroom."

In *Daubert*, the court commented as follows that if a party believes that the trial court has failed in its gatekeeper role by erroneously admitting unsound scientific evidence, the party may employ traditional methods of attacking the evidence:

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. * * * Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment * * *. These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Id.*, 509 U.S. at 596, 113 S.Ct. at 2798, 125 L.Ed.2d at 484.

Thus, traditional methods of attacking "shaky but admissible evidence" give parties the opportunity to challenge disputed scientific evidence.

In *Gen. Elec. Co. v. Joiner* (1997), 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508, the court rejected the argument that the trial court's new "gatekeeper" role in screening scientific evidence pursuant to *Daubert* somehow altered the standard of review that appellate courts must apply when reviewing rulings admitting or excluding expert scientific evidence. In *Gen. Elec. Co.*, the court wrote as follows:

"We granted certiorari in this case to determine what standard an appellate court should apply in reviewing a trial court's decision to admit or exclude expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469] (1993). We hold that abuse of discretion is the appropriate standard." 522 U.S. at 138–139, 118 S.Ct. at 515, 139 L.Ed.2d at 514.

▮ Thus, the abuse of discretion standard of review applies when appellate courts review trial court decisions to admit or exclude expert scientific evidence in accordance with *Daubert.*

Once again, we note that an abuse of discretion connotes more than an error of law or judgment. We again note that in *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126–127, 482 N.E.2d 1248, 1252, the court wrote as follows that an abuse of discretion involves a result "palpably and grossly violative of fact and logic":

"The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations. In order to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias."

Thus, an abuse of discretion will not be found when the reviewing court simply could maintain a different opinion were it deciding the issue *de novo.* Rather, an abuse of discretion indicates an attitude that is unreasonable, arbitrary, or unconscionable. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601.

In the case *sub judice,* we find no abuse of discretion with the trial court's decision to admit Dr. Brookshire's testimony. Although we might have chosen to exclude Dr. Brookshire's testimony, we find nothing unreasonable, arbitrary, or unconscionable with the trial court's decision to admit Dr. Brookshire's testimony. We note that Dr. Brookshire's testimony arguably supports the scientific validity and relevance of his methodology of calculating the monetary value of appellee's loss of enjoyment of life's pleasurable activities. Dr. Brookshire testified that his methodology has been the subject of one hundred articles published in the economics literature. Dr. Brookshire compared his figure of the value of human life with figures from the Occupational Health and Safety Administration and the Nuclear Regulatory Commission. Appellant presented no evidence to prove that Dr. Brookshire's methodology was unscientific, not generally accepted, or otherwise infirm.

We acknowledge that although appellant presented no evidence to prove that Dr. Brookshire's methodology was flawed, appellant cited various federal district court cases that excluded willingness-to-pay hedonic damages testimony by Stan Smith, an economist who apparently co-authored Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys in 1990 with Dr. Brook-

shire.[2] See *Kurncz v. Honda N. Am., Inc.* (W.D.Mich.1996), 166 F.R.D. 386; *Ayers v. Robinson* (N.D.Ill.1995), 887 F.Supp. 1049; *Sullivan v. U.S. Gypsum Co.* (D.Kan.1994), 862 F.Supp. 317; *Mercado v. Ahmed* (N.D.Ill.1991), 756 F.Supp. 1097, affirmed in (C.A.7, 1992), 974 F.2d 863. We agree with appellant that Stan Smith's proposed testimony in those cases bears strikingly similarity to Dr. Brookshire's testimony in the case *sub judice.*

We also agree with appellant that those cases provide cogent reasons for excluding Dr. Brookshire's testimony in the case *sub judice.* In *Kurncz,* the court noted that the willingness-to-pay methodology "values life or the enjoyment of life according to how much people are willing to pay for safer living." The *Kurncz* court reasoned that the willingness-to-pay method of calculating hedonic damages includes assumptions that cannot be validated, including the assumption that people consider and accurately evaluate the risks they face when making purchases or choosing employment, the assumption that people have freedom to choose whether to work in a high risk or a low risk job, and the assumption that risk calculation governs decision-making. Accord *Hein v. Merck & Co., Inc.* (M.D.Tenn.1994), 868 F.Supp. 230, 234. The *Kurncz* court also noted that the willingness-to-pay method involves a certain "eyeballing" in selecting a statistical life value because "[e]conomists' studies have varied tremendously in their valuations, arriving at figures as disparate as $100,000 and $12,000,000," and "[i]n the government regulation arena, the figures have varied between $70,000 to $132,000,000." See, also, *McGuire v. Santa Fe* (D.N.M.1996), 954 F.Supp. 230, in which the expert witness concluded that the economic value of a human life ranges from $928,000 to $18,464,000. The *Kurncz* court concluded that "in the end, Mr. Smith's method is nothing more than a compilation of lay responses." For those reasons, the *Kurncz* court rejected the willingness-to-pay methodology employed by Stan Smith in that case and by Dr. Brookshire in the case *sub judice.*

In *Ayers,* the court found that "the entire process of selecting and adjusting willingness-to-pay data has proven unreliable because of the widely divergent views among economists concerning what does and does not constitute a sound study." 887 F.Supp. at 1061. The *Ayers* court also noted that the willingness-to-pay methodology estimates the value of a statistical person, not the value of the plaintiff's particular life. After noting that in his expert testimony, Stan Smith referred to Adam Smith's 1776 work An Inquiry into the Nature and Causes of the Wealth of Nations, the *Ayers* court caustically commented:

---

2. Again, we note that in *Ayers v. Robinson* (N.D.Ill.1995), 887 F.Supp. 1049, the court commented that the hedonic damages expert witness in that case, Stan Smith, co-authored Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys (1990 with 1992–1993 cum. supp.) with Michael Brookshire.

"By seeking to portray as a genealogical credential the exceedingly tenuous connection between his willingness-to-pay methodology and Adam Smith's *Wealth of Nations,* Stan Smith coats his novel use of a quite recent economic theory with a vintage veneer that it does not deserve." 887 F.Supp. at 1063.

In the case *sub judice,* Dr. Brookshire likewise referred to Adam Smith's work in an attempt to give the willingness-to-pay methodology a genealogical credential.

In *Sullivan,* the court noted that the willingness-to-pay methodology does not take into account any particular facts about the plaintiff. Accord *Kurncz, supra; Patch v. Glover* (1993), 248 Ill.App.3d 562, 188 Ill.Dec. 13, 618 N.E.2d 583. See, also, *Ramos v. Kuzas* (1992), 65 Ohio St.3d 42, 600 N.E.2d 241, in which the court held that because a newborn has not had adequate time to develop an ability to perform a pleasurable activity, a newborn cannot suffer hedonic damages. The *Sullivan* court additionally noted that damages for loss of enjoyment of life "are, by their very nature, not amenable to such analytical precision." 862 F.Supp. at 321. The *Sullivan* court believed that "a jury is capable of determining these losses from its own experiences and knowledge, and through testimony" about the plaintiff's life. *Id.*

In *Mercado,* the district court rejected the willingness-to-pay methodology because "there is no basic agreement among economists as to what elements ought to go into the life valuation," and because the willingness-to-pay evidence is founded on the consensus "of persons who are no more expert than are the jurors on the value of the lost pleasure of life." 756 F.Supp. at 1103. The circuit court affirmed and additionally commented that "we have serious doubts about [Stan Smith's] assertion that the studies he relies upon actually measure how much Americans value life." 974 F.2d at 870. In this vein, the circuit court noted that many noneconomic factors influence purchases of safety items and choices of occupations.

Once again we note that although we agree with appellant that the above cases provide cogent reasons for excluding Dr. Brookshire's testimony, we find no abuse of discretion with the trial court's decision in the case *sub judice* to admit Dr. Brookshire's testimony. We cannot say that the trial court's decision was arbitrary, unreasonable, or unconscionable.[3] We believe that the evidence in

---

**3.** According to appellee, other Ohio common pleas courts have admitted Dr. Brookshire's willingness-to-pay testimony. At footnote 4 of his appellate brief filed on March 11, 1997, appellee wrote as follows:

"Following the *Fantozzi* decision, Dr. Brookshire has been permitted to testify regarding lost ability to function in Ohio in the following cases: *Thrope v. Rosen,* Civil Action No: A9–403710, Hamilton County Court of Common Pleas (1996); *Gibson v. GRE Insurance Group,* Civil Action No: 92CVC–08–318, Delaware County Court of Common Pleas (1994), *Dalton v.*

question falls into the "shaky but admissible" category of evidence envisioned in *Daubert.*

In conclusion, we note that in *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 614, 687 N.E.2d 735, 741, the court cautioned as follows against using the *Daubert* test to exclude all evidence of questionable reliability:

"Furthermore, the reliability requirement of *Daubert* should not be used to exclude all evidence of questionable reliability, nor should a court exclude such evidence simply because it is confusing. *In re Paoli RR. Yard PCB Litigation* (C.A.3, 1994), 35 F.3d 717, 744. Instead, there must be something that makes the scientific technique particularly overwhelming to laypersons for the court to exclude such evidence. *Id.* at 746."

In the case *sub judice,* there is arguably nothing in Dr. Brookshire's methodology that makes it particularly overwhelming to laypersons. Dr. Brookshire's testimony arguably supports the scientific validity and relevance of his methodology of calculating the monetary value of appellee's loss of enjoyment of life's pleasurable activities. The trial court thus did not abuse its discretion when performing its *Daubert* "gatekeeper" function. After the trial court admitted Dr. Brookshire's testimony, appellant had the opportunity to employ traditional methods of attacking Dr. Brookshire's evidence, including "vigorous cross-examination, presentation of contrary evidence, and [a request for] careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798, 125 L.Ed.2d at 484.

Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.

## IV

In its fourth assignment of error, appellant asserts that the trial court erred by failing to instruct the jury to limit its consideration of medical expenses incurred by appellee to those expenses documented in appellee's medical exhibit binder. The binder included only about ten percent ($13,221.37) of the $125,000 to $130,000 of medical expenses that appellee testified he incurred. Appellant claims that because appellee never produced any medical bills during the discovery process and because appellee failed to present testimony to prove the reasonableness or necessity of the medical expenses, the trial court should not have permitted the jury to consider the medical expenses that were not in the binder.

*O'Roark Const. Co.,* Civil Action No: A91–02169, Hamilton County Court of Common Pleas (1994), *Harrison v. Lunde,* Civil Action No: A91–03456, Hamilton County Court of Common Pleas (1993)."

In response, appellee argues that appellant never questioned him on cross-examination about the reasonableness or necessity of the medical expenses and never presented any other evidence to question the reasonableness or necessity of the medical expenses. Appellee further argued that Ohio case law does not require expert testimony in this regard.

In reply, appellant cited *Davidson v. Brockman* (Dec. 30, 1982), Franklin App. No. 82AP–610, unreported, 1982 WL 4617, for the proposition that personal injury plaintiffs must present expert testimony to demonstrate the reasonableness and necessity of medical expenses. In *Davidson,* the court commented, "In any event, expert testimony is required to support the necessity of the services."

After *Davidson,* the Ohio Supreme Court held that proof of the amount paid for medical services is prima facie evidence of the necessity and reasonableness of the charges. In *Wagner v. McDaniels* (1984), 9 Ohio St.3d 184, 9 OBR 469, 459 N.E.2d 561, paragraph one of the syllabus, the court held as follows:

"Proof of the amount paid or the amount of the bill rendered and of the nature of the services performed constitutes prima facie evidence of the necessity and reasonableness of the charges for medical and hospital services. (*DeTunno v. Shull,* 166 Ohio St. 365, [2 O.O.2d 281, 143 N.E.2d 301], modified.)" Accord *Fiorini v. Whiston* (1993), 92 Ohio App.3d 419, 635 N.E.2d 1311; *Chiropractic Clinic of Solon v. Kutsko* (Dec. 5, 1996), Cuyahoga App. No. 70119, unreported, 1996 WL 695637.

In *Wagner,* the court found that the victim's physical and psychological symptoms supported the necessity of the services she received. With regard to the reasonableness of the services, the *Wagner* court found that evidence of the amount of the medical charges was prima facie evidence of the reasonableness of the charges. The *Wagner* court specifically rejected the notion that the plaintiff must bring in the accounting head of the medical facility or other experts to testify about the reasonableness of the charges.

In the case *sub judice,* testimony by appellee and others concerning the extent of his injuries supported the necessity of the medical services he received. Appellant presented no evidence to the contrary. Appellee's testimony about the amount of the medical charges constituted prima facie evidence of the reasonableness of the medical charges. Appellant had the opportunity to cross-examine appellee concerning the medical charges. Appellant presented no evidence to rebut the presumption that the medical charges were necessary and reasonable.

Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error.

V

In his first assignment of error, appellee contends that the trial court erred by granting appellant's motion for directed verdict on the punitive damages claim. Appellee acknowledges that to prove a punitive damages claim, a plaintiff must present evidence that the defendant acted with actual malice or with conscious disregard for the rights and safety of others. Appellee claims that three items of evidence prove that appellant acted with conscious disregard for the rights and safety of others. First, in a February 7, 1994 letter from appellant's vice-president Howard Sager to the South Point Ethanol Director of Operations, Sager admitted that after the accident he discovered that stress corrosion fatigue was present in the rotating assembly when it was released for use by South Point Ethanol and appellee. Second, appellant guaranteed the rebuilt rotating assembly would be as good as new. Third, appellee's expert R. Dean Harris testified that appellant's practice of not using new three-fourth-inch stainless steel connecting screws to join the bowl to the flange extension violated accepted practices and standards in the industry. Appellee claims that these three items of evidence would have been sufficient to support an award of punitive damages.

In response, appellant argues pursuant to R.C. 2315.21(C)(3) that appellee must prove punitive damages by clear and convincing evidence. Appellant cites *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, and *Cabe v. Lunich* (1994), 70 Ohio St.3d 598, 640 N.E.2d 159, for the proposition that in Ohio a plaintiff must prove that the defendant acted with actual malice before the plaintiff may recover punitive damages. Appellant notes that in the case *sub judice,* appellee presented no evidence that appellant acted with actual malice. Appellant notes that although more than five thousand of its decanter centrifuges have logged an "astronomical number" of hours of operation, no similar accident has ever occurred.

In reply, appellee contends that actual malice may be inferred. Appellee argues that the jury could have inferred actual malice from the fact that appellant failed to use new stainless steel connecting screws and the fact that appellant guaranteed the product to be the same as new.

Civ. R. 50(A)(4) provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

■ When determining a motion for a directed verdict, the trial court must submit an essential issue to the jury if there is sufficient credible evidence to permit reasonable minds to reach different conclusions on that issue. If, however, all the evidence, when construed most strongly against the movant, permits only a finding against the other party, then the trial court must instruct a finding or direct a verdict against that party. *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 671 N.E.2d 252; *Helmick v. Republic–Franklin Ins. Co.* (1988), 39 Ohio St.3d 71, 529 N.E.2d 464; and *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896.

■ A trial court considering a motion for directed verdict must determine not whether one version of the facts presented is more persuasive than another; rather, the trial court must determine whether the trier of fact could reach only one result under the theories of law presented in the complaint. *Eldridge v. Firestone Tire & Rubber Co.* (1985), 24 Ohio App.3d 94, 24 OBR 164, 493 N.E.2d 293. A motion for directed verdict tests the legal sufficiency of the evidence. *Id.* The trial court may not weigh the evidence or try the credibility of witnesses but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. *Id.* A directed verdict motion is made at trial and decided on the evidence that has been admitted. *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 551 N.E.2d 172. The "reasonable minds" test of Civ. R. 50(A)(4) requires the court to determine only whether there is any evidence of substantial probative value in support of the nonmoving party's claim. *Id.* Thus, a motion for a directed verdict should be denied where the party against whom the motion is made has offered evidence tending to support all material issues necessary to constitute a prima facie case.

In the case *sub judice*, we agree with the trial court that appellee failed to present sufficient evidence to support an award of punitive damages. In *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus, the court held as follows:

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Accord *Malone v. Courtyard by Marriott L.P.* (1996), 74 Ohio St.3d 440, 445–446, 659 N.E.2d 1242, 1247.

In the case *sub judice*, appellee failed to present sufficient evidence of actual malice. The evidence presented at trial, when construed most strongly in favor of appellee, does not support an award of punitive damages. The fact that Sager admitted that after the accident he discovered that stress corrosion fatigue had been present in the rotating assembly before the accident does not prove that

appellant knew about the fatigue before the accident. The fact that appellant guaranteed that the rebuilt rotating assembly would be as good as new does not prove that appellant acted with hatred, ill will, or a spirit of revenge, and does not prove that appellant exhibited a conscious disregard for the rights and safety of appellee. The fact that appellant's practice of not using new three-fourth-inch stainless steel connecting screws to join the bowl to the flange extension violated accepted practices and standards in the industry also does not prove that appellant acted with hatred, ill will, or a spirit of revenge, and does not prove that appellant exhibited a conscious disregard for the rights and safety of appellee. Thus, we find no error with the trial court's decision granting appellant's motion for a directed verdict on the issue of punitive damages.

Accordingly, based upon the foregoing reasons, we overrule appellee's first assignment of error.

## VI

In his second assignment of error, appellee contends that the trial court erred by denying his motion for prejudgment interest pursuant to R.C. 1343.03(C). Appellee claims that he presented evidence sufficient to demonstrate that he made a good faith effort to settle the action and that appellant did not make a good faith effort to settle the action. Appellee contends, *inter alia,* that appellant's insurer's claim file demonstrates that appellant failed to make a good faith effort to settle the action.

In response, appellant notes that we may not reverse a trial court's judgment concerning prejudgment interest unless that judgment constitutes an abuse of discretion. Appellant argues that the trial court's decision denying prejudgment interest does not constitute an abuse of discretion. In support of this argument, appellant notes, *inter alia,* that (1) this case involved thousands of pages of documents and over thirty depositions; (2) appellant settled with South Point Ethanol just one week prior trial; (3) appellant did not receive a settlement demand from appellee until one month prior to trial; (4) discovery continued until eleven days prior to trial; (5) two days before the discovery cut-off date, appellant received documents from South Point Ethanol, which documents appellant alleges "clearly showed that the accident in this case resulted from the presence of a foreign object left inside the cover of the centrifuge by South Point Ethanol employees"; and (6) these documents gave appellant "reason to believe that it would succeed in absolving itself from liability at trial." Appellant contends that these factors and others demonstrate that appellant did not fail to make a good faith effort to settle the case.

In reply, appellee notes that appellant did not introduce the allegedly favorable South Point Ethanol documents into evidence at trial. Appellee further notes

that it is unclear whether the trial court read appellant's insurer's claim file before the trial court denied appellee's motion for prejudgment interest.

■ We agree with appellant that the abuse of discretion standard of review applies to decisions on motions for prejudgment interest. See *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 202–203, 495 N.E.2d 572, 574. Once again, we note that an abuse of discretion connotes more than an error of law or judgment—it involves a result that is "palpably and grossly violative of fact and logic." *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 127, 482 N.E.2d 1248, 1252.

In the case *sub judice,* we find no abuse of discretion with the trial court's decision denying appellee's motion for prejudgment interest. R.C. 1343.03(C) permits trial courts to award prejudgment interest as follows:

"(C)(1) In addition to the post-judgment interest described in division (B) of this section, interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties shall be computed from the date the plaintiff gave the defendant written notice in person or by certified mail that the cause of action accrued until the date that the judgment, decree or order for the payment of money is rendered or from the date the plaintiff filed a complaint to commence the civil action until the date that the judgment, decree, or order for the payment of money is rendered, whichever time period is longer, *if,* upon motion of any party to the civil action, *the court determines* at a hearing held subsequent to the verdict or decision in the civil action *that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."* (Emphasis added.)

In *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, syllabus, the court defined as follows what constitutes the absence of a failure to make a good faith effort to settle the case:

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer."

■ Thus, if a party has fully cooperated in discovery proceedings, has rationally evaluated risks and potential liability, has not attempted to unnecessar-

ily delay the proceedings, and has made a good faith monetary settlement offer or responded in good faith to an offer, that party has not failed to made a good faith effort to settle the action.

In the case *sub judice*, the trial court's ruling denying appellee's motion for prejudgment interest is not "palpably and grossly violative of fact and logic." The record supports a finding that appellant cooperated in the extensive discovery proceedings in this action, rationally evaluated its risks and potential liability, did not attempt to unnecessarily delay the proceedings, and participated in settlement negotiations in good faith. We note that this action involved thousands of pages of documents and over thirty depositions. We further note that appellant settled its action against South Point Ethanol just one week prior trial. Last, we note that less than two weeks before trial appellant received documents from South Point Ethanol, which documents appellant alleges "clearly showed that the accident in this case resulted from the presence of a foreign object left inside the cover of the centrifuge by South Point Ethanol employees." The existence of these documents arguably gave appellant an excuse for not attempting further settlement negotiations prior to trial. *Kalain, supra.*

Accordingly, based upon the foregoing reasons, we overrule appellee's second assignment of error.

*Judgment affirmed.*

KLINE, J., concurs.

HARSHA, J., concurs in Assignments of Error Nos. I, II, and IV and Cross–Assignments of Error Nos. I and II, and concurs in judgment only as to Assignment of Error No. III.