JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Jerome Dunbar appeals from his conviction on one count of importuning. His sole assignment of error complains that the states' inquiry into pretrial plea discussions and its impeachment of him with an unauthenticated document constituted prosecutorial misconduct and deprived him of a fair trial. We find that the state engaged in misconduct by using the unauthenticated statement and that the misconduct deprived Dunbar of a fair trial. We reverse and remand for a new trial.
 {¶ 2} The state charged that Dunbar had importuned[1] his girlfriend's 13-year-old daughter by asking her if he could "lick [her] private area." Just four days after making the complaint, the mother and victim formally withdrew the charges against Dunbar. The charges were reinstated only after the victim later wrote a police detective a letter in which she restated her initial allegations and expressed concern that Dunbar would retaliate against her and her father. The mother remained convinced that the victim had fabricated the charges against Dunbar, so the mother testified during the state's case in chief on cross-examination as a court's witness. The mother said that although she initially supported the victim's accusations, she *Page 4 
subsequently withdrew the complaint against Dunbar because she found too many inconsistencies in the victim's story to find her believable.
 {¶ 3} Dunbar testified and recounted a lengthy criminal history, telling the jury that he had been to prison three times. He said that he had entered pleas in those cases because he had been guilty. When asked why he was not entering a plea in this case, Dunbar said, "[b]ecause I'm not guilty. This did not happen." He repeated this assertion a second time during his direct testimony.
 {¶ 4} On cross-examination, the state's first line of questioning concerned plea negotiations:
 {¶ 5} "Q. I have some questions about your direct testimony. First thing that comes to mind, first that comes to mind is, you don't go to trial when you know you're guilty, you get the best deal the State of Ohio and your defense attorney can reach, right?
 {¶ 6} "A. That's what I have done, yes.
 {¶ 7} "Q. Fact of the matter is, you sought a plea bargain in this case.
 {¶ 8} "MR. MURNER: Objection.
 {¶ 9} "A. Y'all came to me. You came to me.
 {¶ 10} "THE COURT: Approach.
 {¶ 11} "A. You came to me with that." *Page 5 
 {¶ 12} The parties met at the sidebar, off the record. The court then sustained Dunbar's objection and ordered the jury to disregard the question and Dunbar's response. The state then asked:
 {¶ 13} "Q. Sir, you're subject to, in this case, if convicted, reporting requirements with the county sheriff's office, correct?
 {¶ 14} "A. Yes, I was told that, yes.
 {¶ 15} "Q. And that's the reality of it; that is your biggest concern, isn't it?"
 {¶ 16} The court again ordered counsel to approach and conducted an off the record sidebar. When the court went back on the record, the state moved to a new line of questioning.
 {¶ 17} At the close of all evidence, Dunbar requested a mistrial based upon the state's representation that there had been pretrial plea bargaining in the case. The state opposed the motion by arguing that Dunbar had opened the door to such testimony by mentioning plea bargaining. The court denied the motion.
 {¶ 18} Dunbar argues that the assistant prosecuting attorney committed repeated misconduct during trial by referencing pretrial plea negotiations and the possibility that if convicted he would be subject to reporting requirements as a sexually oriented offender
 {¶ 19} In State v. Davis, 116 Ohio St.3d 404, 2008-Ohio-2,1J228, the supreme court stated: *Page 6 
 {¶ 20} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. State v. Smith (1984), 14 Ohio St.3d 13,14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysisIs the fairness of the trial, not the culpability of the prosecutor.'Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940,71 L.Ed.2d 78."
 {¶ 21} Evid.R. 410(A)(5) states:
 {¶ 22} "(A) Except as provided in division (B) of this rule, evidence of the following is not admissible in any civil or criminal proceeding against the defendant who made the plea or who was a participant personally or through counsel in the plea discussions:
 {¶ 23} "* * *
 {¶ 24} "(5) Any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty or that result in a plea of guilty later withdrawn."
 {¶ 25} Although Evid.R. 410(A)(5) refers only to "statements" made during the course of plea discussions, the courts have consistently understood the rule to foreclose, with certain inapplicable exceptions, any mention of plea discussions because such evidence is irrelevant. By analogy to Evid.R. 408, which prohibits the introduction of offers to compromise a claim, it is understood that such offers are *Page 7 
"incompetent as a fact from which liability which might be inferred and was incompetent as an admission of such liability." See Staff Note to Evid.R. 408; Sherer v. Piper Yenney (1875), 26 Ohio St. 476, paragraph one of the syllabus ("the fact that an offer to compromise the matters in dispute between the parties was made, is incompetent, either as evidence of a fact from which the liability of the party making the offer may be inferred, or as an admission of such liability.").
 {¶ 26} Two reasons have been given for excluding evidence of pretrial offers to compromise. First, excluding such evidence encourages parties to settle their disputes because they may be wary of entering into open and honest settlement negotiations if they knew that the negotiations would be discussed and used against them at trial. Fireman's Fund Ins.Co. v. BPS Co. (1985), 23 Ohio App.3d 56, 62. Second, settlement negotiations are sometimes irrelevant to the questions concerning liability because settlements may be reached for reasons having nothing to do with liability. Schafer v. RMS Realty (2000), 138 Ohio App.3d 244,295; 2 McCormick on Evidence (5th Ed. 1999) 183, Section 266.
 {¶ 27} These reasons apply with even more force in criminal plea bargaining. Although often derided,[2] plea bargaining has been embraced by the courts. In *Page 8 Bordenkircher v. Hayes (1978), 434 U.S. 357, 361-262, the United States Supreme Court stated:
 {¶ 28} "We have recently had occasion to observe that: Whatever might be the situation in an ideal world, the fact is that the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned." (Citation omitted.)
 {¶ 29} Given this benefit, the courts have acknowledged that if a policy of plea bargaining "is to be fostered, it is essential that plea negotiations remain confidential to the parties if they are unsuccessful. Meaningful dialogue between the parties would, as a practical matter, be impossible if either party had to assume the risk that plea offers would be admissible in evidence." United States v.Verdoorn (C.A.8, 1976), 528 F.2d 103, 107.
 {¶ 30} By these standards, the state was prohibited from asking Dunbar whether he had sought a plea bargain in the case. The question was irrelevant and did not purport to offer otherwise admissible evidence into the record.
 {¶ 31} The state incorrectly maintains that Dunbar opened the door to this question by acknowledging his prior guilty pleas and stating that he did not plead guilty in this case because of his innocence. The evidentiary concept of "opening the door" embodies the concepts of waiver and fairness. If one party offers evidence that is otherwise inadmissible as being irrelevant under the rules of evidence, the *Page 9 
courts will consider that a waiver of the rules and in fairness allow the opposing party to present testimony or evidence on the same point.
 {¶ 32} Dunbar did not open the door to evidence about any plea negotiations that might have occurred in this case. He simply referred to past guilty pleas that he had entered because of his admitted guilt, while maintaining that his decision to go forward with trial in this case was because he was innocent. He made no claims whatsoever to any plea bargaining in this case.
 {¶ 33} Moreover, the state's question as to whether Dunbar initiated plea negotiations finds no basis in the record and is contradicted by the state's own pretrial representations to the court. Just prior to the commencement of voir dire, the court asked the parties to state whether there had been any plea discussions between Dunbar and the state. The state told the court that "[a]t this point no request by the defense has been made to enter into any plea discussions, and likewise, the State of Ohio has not approached the defense or engaged in any such negotiations." Defense counsel confirmed the state's statement by saying, "[a]nd as far as plea bargains for any settlement offers that have been made, I would say that Mr. Dunbar has steadfastly maintained his innocence in that matter, and we're willing to proceed to trial." The court confirmed that fact with Dunbar prior to empaneling the jury by stating, "as far as plea discussions, it's this Court's understanding that there haven't been any plea discussions between either the State of Ohio or your counsel." The state remained silent and did not contradict the *Page 10 
court's understanding. There is no indication in the record of any subsequent plea discussions between Dunbar and the state.
 {¶ 34} Having represented to the court that there were no plea negotiations in the case, and having taken no steps to ensure that the record otherwise reflected whether there had been any further discussions between the parties, we find that the state engaged in clear misconduct by asking Dunbar whether he had initiated plea discussions with the state. The state's question was a violation of Evid.R. 410(A)(5) and, at least on the record before this court, was a contradiction of pretrial representations it made to the court.
 {¶ 35} Having found that the state engaged in misconduct, we must next determine whether this question "deprive[d] the defendant of a fair trial." State v. Loza, 71 Ohio St.3d 61, 78, 1994-Ohio-409. InStrickland v. Washington (1984), 466 U.S. 668, 685, the United States Supreme Court stated that "a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."
 {¶ 36} When the court sustained Dunbar's objection to the state's question about plea discussions, it told the jury that "the last question, that response and question, that's stricken from the record. You're not to consider that." Moreover, the court repeated the limiting instruction to the jury just before charging it, and specifically told the jury to disregard any testimony relating to plea discussions and any reporting requirements. We presume that the jury follows and obeys the court's *Page 11 
cautionary or limiting instructions. See State v. Franklin (1991),62 Ohio St.3d 118, 127.
 {¶ 37} Dunbar acknowledges this limiting instruction, but cites toDunn v. United States (C.A.5, 1962), 307 F.2d 883, 888, for the proposition that "`if you throw a skunk into the jury box, you can't instruct the jury not to smell it." He maintains that the state's question about plea bargaining implied that he lied about his reasons for not pleading guilty, thus undermining his defense to the point that he could not receive a fair trial.
 {¶ 38} It is difficult to conclude that the state's question deprived Dunbar of the right to a fair trial when he purposely adopted a strategy that placed his prior convictions before the jury. He not only admitted to three prior prison sentences, but said that he had four or five prior felony cases, including assault of a police officer and drug trafficking. He stated that he was a contract driver for a logistical company, but admitted "my driving record is terrible." Dunbar conceded that he drinks, sometimes to excess, and that he and the victim's mother had in the past argued over financial matters. Even without the state's question about plea discussions, Dunbar's trial strategy may have been overly optimistic in thinking that the jury would only consider his three prior felony imprisonments for the limited purpose of showing that his decision to go forward with trial in this case had been motivated by innocence. After considering his testimony, we cannot conclude that the state's *Page 12 
question about plea discussions, taken in isolation, so prejudiced the jury against Dunbar that a fair trial was an impossibility.
 {¶ 39} Dunbar argues that in addition to the question about plea discussions, the state also engaged in questioning that was designed to elicit repeated objections. In particular, he points to questions referencing the victim's interview with Lawrence Petrus, a social worker for the Cuyahoga County Department of Children and Family Services, conducted shortly after the initial complaint had been made. The state continually referenced Petrus' notes to impeach the mother, even though Petrus did not testify at trial and no one from the Cuyahoga County Department of Children and Family Services authenticated the notes.[3]
For example, the state asked the mother, "[d]o you remember telling Larry Petrus that you believe your daughter and can't take any chance that won't escalate?" Later, the state asked the mother, "[d]o you remember telling Larry Petrus, the CFS worker, Children Family Services Worker, same guy, same statement here, that Jerome stated to you he can't remember what happened but also wouldn't deny it because he was drunk[?]" When the mother said that she could not recall saying that, the state asked, "[s]o is that another mystery of how that wound up in your statement with the Children and Family Services worker?" *Page 13 
 {¶ 40} It is improper to attempt to communicate by innuendo through the examination of a witness when the inquiring party does not have a good-faith basis that a factual predicate for the question exists. SeeState v. Gillard (1988), 40 Ohio St.3d 226, paragraph two of the syllabus.
 {¶ 41} It appears that the state had no intention to offer Petrus' testimony because its response to Dunbar's request for discovery did not list Petrus or any other potential witnesses from the agency. Although Petrus' notes were excluded by the court and are not a part of the record on appeal, the trial transcript shows that Dunbar objected to the notes on grounds that the notes had "none of the marking[s] of authentication[.]" Dunbar argued that the notes were unsigned and did not even have Petrus' name on them. He also pointed out that the notes did not contain any direct quotes from the victim. In short, Dunbar's counsel characterized the document, without any contradiction from the state, as being nothing more than "a piece of paper with stuff written on it[.]" It is of no consequence to our analysis that the mother acknowledged that she spoke with Petrus, and at points even agreed that some of his purported recollections matched her own. The mother did not and could not authenticate Petrus' notes. Moreover, she disagreed with a number of specific points allegedly contained in the notes. The accuracy of the notes was clearly in question, and absent authentication of those notes, we conclude that the state lacked a good faith basis for using them to cross-examine the mother. *Page 14 
 {¶ 42} Having found that the state engaged in misconduct, we again must consider whether that misconduct deprived Dunbar of a fair trial; that is, a trial in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The state's use of unauthenticated notes from an absent witness was evidence that could not be tested in an adversarial manner. In addition, the state's use of these notes was crucial to its case because they purported to contain comments made by the mother that would impeach her testimony. For example, she allegedly told Petrus that she "asked Jerome to move out because of what happened to [the victim];" that the victim "wouldn't have any reason to lie;" and that Jerome told her that "he did it but he was drunk[.]" Objections were offered to all of these statements but were overruled.
 {¶ 43} The state did not use Petrus' notes in an isolated manner. At one point, Dunbar objected to the repeated references to Petrus' notes, asking "[a]re we going to go through this line by line?" The state replied, "[w]e are." The court overruled the objection and allowed the state to continue asking questions based on the unauthenticated notes.
 {¶ 44} We conclude that the state's use of unauthenticated notes from a non-testifying witness deprived Dunbar of a fair trial. This was not a case in which the evidence strongly favored the state. The evidence consisted solely of the victim's testimony that Dunbar woke her at 5:00 a.m. and asked her if she wanted to go to *Page 15 
the movies. She did not recall her response to him, and he then asked her if he could "lick her private area." Saying she was scared, she left the room and crawled into bed with her little sister. When she later left her sister's bedroom, she saw that Dunbar was sleeping. Four days after filing charges against Dunbar, she and the mother formally withdrew the complaint. The victim said that she did not agree with the mother's decision, and wrote a police detective a letter in which she restated her allegations against Dunbar, saying that Dunbar asked her if he could "lick me below my stomach." In that letter, which the court admitted into evidence over defense objection, detailed how Dunbar had "disrespected" the mother, an aunt, and a grandmother, and that he had been "putting his hands" on the mother. The letter concluded with the victim's statement that she wanted to live with her father because "I think I would be safer if I was with my dad."
 {¶ 45} The actual evidence of importuning, while legally sufficient to sustain a conviction, was subject to credibility attacks. The victim formally withdrew the charges, only to reinstate them in a decision that she claimed was made by both her father and her. In her letter to the detective, she wrote that:
 {¶ 46} "Jerome has also threatened my daddy saying he gone [sic] do something to my dad. Jerome Dunbar has people coming down my aunt [sic] street while me and my dad was talking to my aunt * * * and a guy rode pass [sic] my aunt *Page 16 
house where my daddy was standing and the guy said bang and made hand [sic] look like a gun and he had a smirk on his face and looked back at my dad."[4]
 {¶ 47} When asked "[w]hose decision was it to sit down with the detective and give him a further statement," the victim replied, "I don't remember."
 {¶ 48} Under any reasonable view of the evidence, the victim appeared to be pulled in opposite directions by her parents — the mother clearly wished to drop the charges and continue her relationship with Dunbar; the father (who did not testify at trial) apparently wished to prosecute Dunbar. The state used Petrus' notes to cast doubt on the mother's credibility, trying to establish that she actually did believe the victim and only changed her mind about prosecuting Dunbar when she realized that his financial support to her would end if he were convicted.[5] Petrus' notes were key to accomplishing this goal, for they purported to show that the mother admitted to Petrus that Dunbar had been drunk, could not remember what happened and therefore could deny the victim's allegations. This hearsay severely undermined the *Page 17 
mother's credibility to the point where it may have persuaded the jury to convict Dunbar, even with the other inconsistencies in the evidence. Because Dunbar had no opportunity to test the validity of this evidence in an adversarial manner, it follows that he did not receive a fair trial. The assigned error is sustained.
 {¶ 49} This cause is reversed and remanded for proceedings consistent with this opinion.
It is, therefore, ordered that said appellant recover of said appellee his costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, JUDGE
ANTHONY O. CALABRESE, JR., P.J., CONCURS
MARY EILEEN KILBANE, J., CONCURS IN JUDGMENT ONLY
[1] R.C. 2907.07(B) states that no person shall solicit another to engage in sexual conduct when the offender is more than 18 years of age and four or more years older than the other person, and the other person is more than 13 years of age but less than 16 years of age.
[2] See, e.g., Alschuler, The Prosecutor's Role in Plea Bargaining (1968), 36 U.Chi.L.Rev. 50, 105; Schulhofer, Plea Bargaining as Disaster (1992), 101 Yale L.J. 1979, 2003 ("Plea bargaining seriously impairs the public interest in effective punishment of crime and in accurate separation of the guilty from the innocent * * * Plea bargaining injures the public interest in optimal deterrence, the defendant's interest in accurately assessing the risk of acquittal, and the societal interest in minimizing conviction of the innocent.").
[3] The victim and mother were the state's only witnesses.
[4] Although the victim did not testify to any of this at trial, the court admitted the letter into evidence over Dunbar's objections. Dunbar has not filed an assignment of error relating to the admission of this letter. We therefore deem the issue waived on appeal and express no opinion on whether it was properly admitted into evidence. State v.Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus.
[5] During its examination of the mother, the mother acknowledged that Dunbar was "the only one" that provided financial support for her children. The state then asked her, over Dunbar's objection, "[a]nd it's your rather desperate attempt to sabotage the allegation * * * that your daughter has made * * * so you can keep Jerome paying the support, because if he wasn't here * * * you'd lose your support. So you've got a * * * real motive to cover this up." *Page 1